ZAHRA, J.
In these three consolidated cases, we address the difficult question of whether defendants’ false statements made while serving as law enforcement officers during an internal affairs investigation can be used against them in criminal proceedings. We conclude that under the disclosures by law enforcement officers act (DLEOA), MCL 15.391 et seq., false or inaccurate information cannot be used against a law enforcement officer in subsequent criminal proceedings. To hold otherwise would defeat the Legislature’s stated intent to preclude the use of “any information,” MCL 15.393, a law enforcement officer is compelled to provide “under threat of. . . any . . . employment sanction,”[1] MCL 15.391(a). And while we agree with the Court of Appeals that the Fifth Amendment of the *338 United States Constitution as interpreted in Garrity v New Jersey[2] does not compel this result, states may provide protections greater than those secured under the United States Constitution, and that is exactly what the Michigan Legislature did when it enacted the DLEOA in 2006. Simply stated, the DLEOA bars the use in a subsequent criminal proceeding of all information provided by a law enforcement officer under threat of any employment sanction. The act does not distinguish between true and false statements. Although the Legislature is free to amend the DLEOA to change the policy enacted, we are not. No matter how we view the policy, we must follow the language chosen by the Legislature. We reverse the judgment of the Court of Appeals and reinstate the orders of dismissal entered in the district court.
I. BASIC PACTS AND PROCEEDINGS
This case arises out of a disturbing encounter between Dajuan Hodges-Lamar and defendants, who at the time were police officers for the city of Detroit. While on duty in November 2009, defendant Hughes approached Hodges-Lamar while he was seated in a car at a gas station. Hughes initially appeared to question Hodges-Lamar, but quickly proceeded to assault him while defendants Harris and Little, who were also on duty, stood by and did nothing to stop the *339 assault. Hodges-Lamar filed a complaint with the Detroit Police Department, which spurred an internal investigation by the Detroit Police Department’s Office of the Chief Investigator (OCI). All three defendants were called to testify at a Garrity hearing.
The OCI presented defendants with an advice-of-rights form drafted by the Detroit Police Department. In relevant part, the form broadly stated:
4. If I refuse ... to answer questions ... I will be subject to departmental charges which could result in my dismissal from the police department.
5. If I do answer. . . neither my statements or any information or evidence which is gained by reason of such statements can be used against my [sic] in any subsequent criminal proceeding.
The language of this form, like the language of DLEOA, did not expressly require truthful answers or truthful statements.[3] Defendants also received a reservation-of-rights form drafted by the Detroit Police Department, which provided, in relevant part, as follows:
It is my belief... that this Statement and the Preliminary Complaint Report will not and cannot be used against me in any subsequent proceedings other than disciplinary proceedings within the confines of the Department itself. For any and all other purposes, I hereby reserve my Constitutional rights to remain silent under the FIFTH and FOURTEENTH AMMENDMENTS [sic] to the UNITED STATES CONSTITUTION, and Article I, Section 17 of the MICHIGAN CONSTITUTION.
*340 All three defendants made false statements at the Garrity hearing. Defendants Harris and Little denied that Hughes had any physical contact with Hodges-Lamar. Hughes admitted that he removed Hodges-Lamar from Hodges-Lamar’s car during questioning, but Hughes maintained that he did not use any unnecessary force against Hodges-Lamar. A video recording of the incident surfaced after defendants had made their statements. The video recording was provided to the OCI.[4]
The video recording is wholly at odds with the statements provided by defendants. The prosecutor charged Hughes with common-law felony misconduct in office, MCL 750.505, misdemeanor assault and battery, MCL 750.81, and obstruction of justice, also under MCL 750.505. Defendants Harris and Little were each charged with one count of common-law obstruction of justice, MCL 750.505. The obstruction-of-justice charges were based on allegations that the officers lied during the initial investigation.
Defendants brought motions in district court to dismiss the obstruction-of-justice charges.[5] The district *341 court concluded that defendants’ statements were protected by the DLEOA, even if the information provided was false or misleading. The court determined that without defendants’ statements the obstruction-of-justice charges could not be sustained and dismissed those charges. The prosecution appealed in the circuit court, which concluded that the district court had not abused its discretion by dismissing the obstruction-of-justice charges.
The prosecution filed applications for leave to appeal in the Court of Appeals with regard to all three defendants. In a published opinion, a divided panel reversed the lower courts and reinstated the obstruction-of-justice charges.[6] The majority recognized that its holding conflicted with People v Allen,[7] which held that “the Fifth and Fourteenth Amendments’ benefits of freedom from [a] coerced waiver of the right to remain silent. . . must be respected,” even in a subsequent perjury prosecution. After noting that Allen was not binding precedent under MCR 7.215(J)(1), the majority concluded that “in light of the post-Gamfy caselaw permitting a witness’s statements to be used against him or her in a subsequent criminal prosecution for a collateral offense such as peijury or obstruction of justice, we expressly disavow Allen’s reasoning.”[8] The majority further concluded that “[t]he district court. . . abused its discretion by excluding defendants’ false statements under MCL 15.393 . . . .”[9] The majority reasoned that “the statute internally limits the phrase ‘involuntary statement’ to *342 include true statements only, and that false statements and lies therefore fall outside the scope of the statute’s protection.”[10]
Judge WILDER dissented from the majority’s determination that false statements fall outside the DLEOA’s scope of protection. Relying on the plain meaning of the words of the act, Judge WILDER reasoned that the protection granted law enforcement officers under the DLEOA applies to all information garnered from an officer during a compulsory internal police investigation.
Defendants filed separate applications for leave to appeal in this Court, each arguing that the Court of Appeals majority erred by concluding that the DLEOA’s scope of protection did not encompass defendants’ false statements. On February 4, 2015, we granted the applications, directing the parties to brief “whether the Disclosures by Law Enforcement Officers Act, MCL 15.391, et seq., precludes the use of false statements by a law enforcement officer in a prosecution for obstruction of justice f.]”[11]
II. STANDARD OF REVIEW
We review de novo constitutional issues and matters of statutory interpretation.[12]
III. ANALYSIS
We must determine whether Michigan law provides these defendants with more protections than those provided under the Fifth Amendment of the United *343 States Constitution.[13] While we touch on the constitutional right against self-incrimination found in the Fifth Amendment and the corresponding provision of the Michigan Constitution, this case does not turn on those constitutional provisions. Defendants do not maintain the protection they seek comes from Garrity or its progeny under federal or Michigan caselaw.[14] Rather, defendants argue that the Legislature, in enacting the DLEOA, chose to afford law enforcement officers greater protection than that available under the Fifth Amendment and that this statutory protection requires dismissal of the obstruction-of-justice charges brought against them. This protection, defendants argue, is found in the plain language of the DLEOA, specifically MCL 16.393, which provides:
An involuntary statement made by a law enforcement officer, and any information derived from that involuntary statement, shall not be used against the law enforcement officer in a criminal proceeding.
*344 The DLEOA defines the term “involuntary statement” as follows:
“Involuntary statement” means information provided by a law enforcement officer, if compelled under threat of dismissal from employment or any other employment sanction, by the law enforcement agency that employs the law enforcement officer.[15]
The prosecution argues this language does not preclude the use in later criminal proceedings of false or misleading information obtained through a Garrity hearing. The prosecution characterizes the language as nothing more than a codification of the Garrity rule as it has been developed through federal caselaw. Thus, the prosecution argues that the DLEOA only provides the protection afforded under the Fifth Amendment. Because the Supreme Court of the United States has made it clear that the Fifth Amendment grants a privilege to remain silent without consequence, but “does not endow the person who testifies with a license to commit perjury,”[16] the prosecution maintains that the DLEOA does not protect from subsequent criminal prosecution a law enforcement officer who provides false or misleading statements in a Garrity hearing.
The plain language of the DLEOA controls our resolution of this dispute and compels us to agree with defendants. Applying traditional principles of statutory construction to the language of the DLEOA, we must conclude that the act sweeps within its scope the false statements offered by defendants. While we may question the Legislature’s decision to offer such unqualified protections, we are obligated to respect that *345 decision and interpret the statute in accordance with its plain language.
A. THE DLEOA’S PROTECTIONS REACH BOTH TRUE AND FALSE STATEMENTS
Our primary focus in this case—and all cases in which we are called upon to interpret a statute—is the language of the statute under review. The words of the statute provide the best evidence of legislative intent and the policy choices made by the Legislature.[17] Our role as members of the judiciary is not to second-guess those policy decisions or to change the words of a statute in order to reach a different result. In fact, a “clear and unambiguous statute leaves no room for judicial construction or interpretation.”[18] Therefore, we start by examining the words of the statute, which “should be interpreted on the basis of their ordinary meaning and the context within which they are used in the statute.”[19]
The Legislature chose to use broad language in the DLEOA. The act prohibits any information derived from an involuntary statement from being used against the officer in a criminal proceeding[20] and also prohibits public access to and disclosure of an involuntary statement, except under certain statutorily enumerated circumstances.[21] The act does not expressly limit the statute’s protections to true statements, nor does it contain any express exception for perjury, lying, providing misinformation, or similar dishonesty. In contrast, numerous statutes concerning the use of *346 compelled testimony contain express exceptions to allow the use of such dishonest testimony for impeachment purposes and in prosecutions for perjury.[22] The Court of Appeals inferred the existence of such a limitation in the DLEOA from the Legislature’s use of the term “information.” While we agree that “information” comprises statements that are true, the word does not exclude statements that are false.
The word “information” is not defined in the statute, but dictionaries define the word broadly as “knowledge communicated or received concerning a particular fact or circumstance”;[23] “[k]nowledge or facts communicated about a particular subject, event, etc.; intelligence, news”;[24] and “the communication or reception of knowledge or intelligence [.] ”[25] The dissent focuses its attention on “knowledge,” but “intelligence” and “news,” both of which are used in dictionaries to describe “information,” can be false.[26] Even “knowledge” can be defined to include “the sum of what is known,”[27] which does not foreclose the possibility of including something that is false.
We may even conclude that “knowledge” in its primary sense encompasses something that is true. But the statute nowhere uses the term “knowledge.” Instead, it protects “statements,” which no one disputes may be false and are statutorily defined as “information.” The critical inquiry is not whether “knowledge” *347 equals “truth,” but whether “information” connotes only truth. Dictionaries, which define “information” as “knowledge,” “intelligence,” or “news,” do not yield a dispositive answer.
Keeping in mind that we must interpret the word “information” as used in the DLEOA “according to the common and approved usage of the language,”[28] we apply a tool that can aid in the discovery of “how particular words or phrases are actually used in written or spoken English.”[29] The Corpus of Contemporary American English (COCA)[30] allows users to “analyze!] ordinary meaning through a method that is quantifiable and verifiable.”[31]
The dissent claims that, in ordinary usage, “we should not think of someone who provided inaccurate statements as having imparted ‘knowledge’ or ‘infor *348 mation’. . . ,”[32] Empirical data from the COCA, however, demonstrates the opposite. In common usage, “information” is regularly used in conjunction with adjectives suggesting it may be both true and false.[33] This strongly suggests that the unmodified word “information” can describe either true or false statements. Moreover, by reading each identified use of the word “information” in its surrounding context,[34] it is clear that “information” is often used to describe false statements.[35] Quite simply, “information” in common parlance describes perceptions conveyed about the world around us, which may be true or false.[36]
*349 The Court of Appeals failed to account for the breadth and scope of the word “information.” We therefore cannot agree that the lay definitions of “information” exclude the falsehoods offered by defendants, or that the Legislature, by merely using that word, intended to impose an inherent requirement of veracity for involuntary statements to be covered under the DLEOA.[37]
To the contrary, examination of the Legislature’s use of “information” in other statutes that existed at the time the DLEOA was enacted leaves no doubt that the unmodified term is properly construed to apply to all “information,” whether true or false. In the years leading up to enactment of the DLEOA, the Legislature frequently modified the word “information” with the word “truthful” when it intended to reach only truthful information. Such an express limitation, found in a number of other statutes, including in statutes involving immunity or compelled statements,[38] *350 is not present here.[39] Of particular relevance is MCL 780.702(3), which governs orders granting *351 immunity to witnesses. The statute expressly limits immunity to “[t] ruthful testimony or other truthful information compelled under the order granting immunity . . . .”[40] Although the statute was first enacted into law in 1968, its limitation of immunity to only truthful information was not present in the statute until 1999—seven years before the Legislature enacted the DLEOA.[41] Similarly, MCL 750.157 prevents certain compelled “[t] ruthful testimony, evidence, or other truthful information” from being used against the person “in a criminal case, except for impeachment purposes or in a prosecution for perjury . . . .”[42]
The presence of the word “truthful” in these statutes is linked to this Court’s ruling in People v Mclntire[43]—a 1999 opinion we find instructive and supportive of our analysis here. At issue in Mclntire was the proper interpretation of transactional immunity for witnesses compelled to answer potentially incriminating questions under MCL 767.6. The statute at the time provided, in relevant part, that “[n]o person required to answer such questions shall thereafter be prosecuted for any offense concerning which such answers may have tended to incriminate him.”[44] In light of this plain language, the Mclntire Court rejected the notion that a grant of immunity under MCL 767.6 extended only to truthful answers, reasoning that the text of the statute was “clear and unambiguous” and “simply [did] not *352 condition . . . immunity on truthful testimony.”[45] In so holding, this Court stressed that it was bound—as we are here—by “traditional principles of statutory construction,” which require courts to “respect the constitutional role of the Legislature as the policy-making branch of government and constrain the judiciary from encroaching on this dedicated sphere of constitutional responsibility.”[46] The Legislature received this message and subsequently amended MCL 767.6 and other statutes accordingly, adding “truthful” to terms such as “testimony” and “information” when the Legislature sought to add that limitation.
The Legislature clearly knows how to limit information based on its veracity when such a limitation is important to conveying its intent. It did so in a number of other statutes it enacted or amended after McIntire, but it chose not to do so in the DLEOA, even though the Legislature had the benefit of Mclntire when it enacted the DLEOA in 2006. We cannot overlook this choice or refuse to give it effect.[47] Accordingly, we conclude that *353 the Legislature intended the word “information,” as used in MCL 15.391, to include no inherent requirement of veracity, but instead to include statements that may be true or false.[48]
*355 B. THE PLAIN LANGUAGE OP THE DLEOA REQUIRES DISMISSAL OF THE OBSRUCTION-OF-JUSTICE CHARGES
Applying this interpretation of the DLEOA’s plain language, the obstruction-of-justice charges brought against defendants must be dismissed. Defendants provided statements regarding their encounter with Mr. Hodges-Lamar under threat of termination; these statements, though false, are protected by the DLEOA and, therefore, cannot be used against defendants in a criminal proceeding. There is no dispute that defendants’ statements provided the only basis for charging them with obstruction of justice and that if this evidence is inadmissible, the charges must be dismissed. According to the Court of Appeals majority, however, this outcome must be rejected because it is “wholly contrary to the Legislature’s purpose in enacting the [DLEOA],” which “was to create a mechanism for facilitating internal police investigations and to provide an incentive for officers who cooperate by providing needed facts.”[49] Justice MARKMAN now echoes this sentiment in dissent, concluding that “[n]o Legislature, and no legislator, could conceivably have intended such a result.”[50]
*356 We understand how this result may be viewed as unpalatable. But as this Court has long made clear, our statutory analysis is controlled by principles of interpretation, not palatability of outcomes. It is not our role to rewrite the law or substitute our own policy judgment in the face of the text of the statute, or “to create an ambiguity where none exists in order to reach a desired result, albeit one with which [we] might wholeheartedly agree [if we were legislators] authorized to enact policy.”[51]
For the reasons discussed in this opinion, we discern from the plain language of the DLEOA a legislative intent to protect all Garrity statements, regardless of their veracity. And while there may be ample room to question the wisdom of such unqualified statutory protections, we see no principled basis for this Court to ignore or reject the Legislature’s enactment of them.
We do not view recognition of these unqualified protections as absurd or flatly at odds with the purpose of the DLEOA. There is seemingly no dispute that the protections offered by the DLEOA are intended to encourage and facilitate officers’ participation in internal investigations, with the goal of rendering those investigations more fruitful and effective. As the plain language of the DLEOA makes clear, the Legislature deemed this purpose best served by not limiting the statute’s protections only to statements that are true. Regardless of whether we agree with this policy determination, we can conceive of reasons for it. The Legislature may very well have viewed the benefit of such a limitation—namely, the ability to criminally prosecute officers for lies told during an internal investigation—as outweighed by *357 its costs. Not all statements, after all, are clearly true or entirely false, and the Legislature may have concluded that qualifying the DLEOA’s statutory protections based on veracity would unduly complicate the implementation of those protections[52] or undermine the certainty and effectiveness of the protections offered. Indeed, the Allen Court observed that the exception to protection for perjured statements is “more precisely stated” as an exception to protection “where the prosecuting authority charges perjury,”[53] a broader scope encompassing prosecutorial discretion and requiring the jury to ultimately decide the falsity of a statement. The Legislature may have reasoned—for better or worse—that it was more beneficial to punish the lies uncovered during the course of internal investigations with internal discipline.[64] We fail to see the absurdity in such reasoning, particularly given that the Legislature knows how to, and does, modify the term “information” with “truthful” when it intends to bring only truthful information within the scope of its legislation. And, as this Court stressed in Mclntire,[55] we need not be sure of the precise reasons for a statutory judgment or be convinced of the wisdom of the legislation.
*358 [I]n our democracy, a legislature is free to make ineffica-cious or even unwise policy choices. The correction of these policy choices is not a judicial function as long as the legislative choices do not offend the constitution. Instead, the correction must be left to the people and the tools of democracy: the ballot box, initiative, referendum, or constitutional amendment.[56]
This statement applies with equal force in the present case. The plain language of the DLEOA protects all statements given by officers under compulsion. This choice may seem odd, or reflective of questionable or even bad public policy, but it was the Legislature’s choice to make. We are not empowered to displace what the law actually provides with a judicial preference for what we believe it should provide.
IV. CONCLUSION
In sum, the Legislature chose not to protect only truthful information when it enacted the DLEOA. This is demonstrated by the plain language of the statute when contrasted with the Legislature’s known capacity to expressly limit the word “information” based on veracity in other statutes when such a limitation is critical to the Legislature’s intent. Accordingly, we must conclude that the DLEOA prohibits the use of an officer’s Garrity statement, even if false, in a criminal proceeding, including one for perjury or obstruction of justice. The Court of Appeals erred by concluding otherwise. We reverse the judgment of the Court of Appeals to the extent it held that, under the DLEOA, a law enforcement officer’s involuntary statement could be used against him or her in a criminal proceeding if the statement was false. We reinstate the orders en *359 tered in the district court that dismissed the obstruction-of-justice charges brought against defendants.
Young, C.J., and McCormack, Bernstein, and LARSEN, JJ., concurred with ZAHRA, J.

 The DLEOA does not provide law enforcement officers with immunity. It only prevents a law enforcement officer’s “involuntary” statements from being used against the officer in a criminal prosecution. MCL 15.391(a); MCL 15.393. A law enforcement officer may be prosecuted for criminal conduct based on evidence other than involuntary statements provided by the officer during an internal inquiry. In the present cases, defendant Hughes is subject to charges independent of the obstruction-of-justice charge that stems from his statement. And while we express no opinion regarding the validity of other charges that could have been asserted against defendants Harris and Little, we note that the Michigan Legislature has made it unlawful for a public official to willfully neglect one’s duty. MCL 750.478.

 The Supreme Court of the United States held in Garrity v New Jersey, 385 US 493, 500; 87 S Ct 616; 17 L Ed 2d 562 (1967), that “the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office .. ..” A hearing in which a law enforcement officer is called on to make a statement under threat of an employment sanction has become known as a “Garrity hearing,” and the statement provided under that threat, a “Garrity statement.” It was at a Garrity hearing that each defendant provided the Garrity statements that led to the common-law obstruction-of-justice charges at issue here.

 Recognizing that the rights granted defendants by the Detroit Police Department in its advice-of-rights form are extremely broad, this Court asked the parties to brief a question not previously raised by either party: “whether the [advice-of-rights form] signed by the defendants bar[s] the use of their statements in a criminal prosecution as violative of state or federal rights against self-incrimination.” People v Harris, 497 Mich 958 (2015). We need not address this issue because the case is fully resolved under the DLEOA.

 The video showed defendant Hughes approach Hodges-Lamar’s vehicle while defendants Harris and Little assumed positions at the rear of the vehicle and the passenger door. Hughes pulled Hodges-Lamar out of the vehicle by his collar, slammed him against the car, and searched him. Meanwhile, Harris and Little had moved closer to Hughes and Hodges-Lamar. Hughes pushed Hodges-Lamar toward Harris and Little. Finally, Hughes can be seen striking Hodges-Lamar with an open hand in the throat, punching him again, pushing him to the ground, picking him up by the collar several times, slamming him onto the car, and pushing him back toward Harris and Little. Afterward, Hodges-Lamar was issued a citation for driving without proof of insurance.

 Defendant Hughes did not challenge the bindover regarding his common-law felony misconduct in office and misdemeanor assault and battery charges. As a result, those charges are not at issue on appeal.

 People v Hughes, 306 Mich App 116; 855 NW2d 209 (2014).

 People v Allen, 15 Mich App 387, 396; 166 NW2d 664 (1968).

 Hughes, 306 Mich App at 128.

 Id.

 Id. at 129.

 Harris, 497 Mich 958.

 People v McKinley, 496 Mich 410, 414-415; 852 NW2d 770 (2014).

 See Malloy v Hogan, 378 US 1; 84 S Ct 1489; 12 L Ed 2d 653 (1964), which applied the Fifth Amendment protection against self-incrimination to the states through the Fourteenth Amendment.

 Many cases have developed Garrity into the rule as it is understood today. As is particularly relevant to this opinion, the Supreme Court of the United States has clarified, since Garrity, that its interpretation of the Fifth Amendment only applies to truthful statements. See, e.g., United States v Wong, 431 US 174; 97 S Ct 1823; 52 L Ed 2d 231 (1977); United States v Apfelbaum, 445 US 115; 100 S Ct 948; 63 L Ed 2d 250 (1980).
As the Court of Appeals correctly observed, however, Michigan caselaw has not expressly kept pace with this federal development of the Garrity rule. The last published authority on the topic came from Allen, 15 Mich App 387, which concluded that Garrity applies to false statements; Allen was not directly repudiated by a Michigan court until the Court of Appeals’ opinion in this case. The parties do not challenge this repudiation, and, given the developments in Garrity jurisprudence in the time since Allen was issued, we see no reason to disturb it.

 MCL 15.391(a).

 Wong, 431 US at 178 (citation and quotation marks omitted).

 White v Ann Arbor, 406 Mich 554, 562; 281 NW2d 283 (1979).

 Coleman v Gurwin, 443 Mich 59, 65; 503 NW2d 435 (1993).

 People v Zajaczkowski, 493 Mich 6, 13; 825 NW2d 554 (2012).

 MCL 15.393.

 MCL 15.395.

 See, e.g., MCL 780.702(3); MCL 750.157; MCL 750.453.

 Random House Webster’s College Dictionary (2003).

 1 Shorter Oxford English Dictionary (6th ed).

 Merriam-Webster’s Collegiate Dictionary (11th ed).

 See Random House Webster’s College Dictionary (2003) (defining “intelligence” as “information received or imparted; news” and defining “news” as “a report of a recent event; information”).

 Id.

 MCL 8.3a.

 State v Rasabout, 2015 Utah 72, ¶ 57; 356 P3d 1258 (2015) (Lee, A.C.J., concurring in part). Linguists call this type of analysis corpus linguistics, but the idea is consistent with how courts have understood statutory interpretation. For instance, the United States Supreme Court has looked to Westlaw and Lexis databases to examine how words are used in ordinary English when examining how Congress intended a particular word or phrase. See Texas Dep’t of Housing & Community Affairs v Inclusive Communities Project, Inc, 576 US _, _; 135 S Ct 2507, 2534; 192 L Ed 2d 514 (2015) (Auto, J., dissenting); Muscarello v United States, 524 US 125, 129; 118 S Ct 1911; 141 L Ed 2d 111 (1998).

 The Corpus of Contemporary American English contains over 520 million words from 220,225 texts, spread evenly among a 25-year period, 1990-2015. The texts include transcripts of live television broadcasts, newspapers, magazines, academic journals, and fiction. Corpus of Contemporary American English, Texts chttps:// corpus.byu.edu/coca/help/texts.asp> (accessed June 6, 2016) [https:// perma.cc//E77D-97XR].

 Mouritsen, Hard Cases and Hard Data: Assessing Corpus Linguistics as an Empirical Path to Plain Meaning, 13 Colum Sci & Tech L Rev 156, 202 (2012).

 Post at 366.

 In conducting a COCA search, the word “accurate” is the most common adjective collocated with “information” to bear a meaning that refers to truth or falsity. The words “false” and “inaccurate” are also commonly collocated with “information.” The collocation search for “information” is available at Corpus of Contemporary American English, “Information” Frequency <http://eorpus.byu.edu/coca/?c=coc&q= 47913597> (accessed June 6, 2016).

 See Hard Cases and Hard Data, 13 Colum Sci & Tech L Rev at 197. This is known as a concordance search. After running a collocation search, a user can retrieve the results of a concordance search by navigating to a collocated word and examining each listing in its full context.

 For example, news stories from 2006—the year the Legislature enacted the DLEOA—describe “heightened publicity about false information on” the Internet and market analysts “who say they witnessed. fellow employees allowing hedge fund clients ... to add false or misleading information” to investment reports. Hafher, Growing "Wikipedia Refines Its ‘Anyone Can Edit’ Policy, New York Times (June 17, 2006); Masters, 2 Firms Claim Conspiracy in Analyst Reports, The Washington Post (April 26, 2006).

 The fact that “information” is often used without a modifying adjective to distinguish its veracity does not, as argued by the dissent, indicate that the word “information” connotes the conveyance of only truthful information. The absence of a modifying adjective around the word is immaterial; the word is used to describe perceptions about the world around us, which may be “true, false, and in-between.” Schieffer, *349 CBS News, The Spread of Measles—And of Lies on the Internet <http://www.cbsnews.com/news/the-spread-of-measles-and-of-lies-on-the-intemet/> (posted February 8, 2015) (accessed June 6, 2016) [https://perma.cc/F4XK-9PAE].

 We see little interpretive import in comparing “information” with “misinformation” and, in light of the definitions discussed in this opinion, are inclined to agree with Judge Wilder’s dissent that the latter is merely a subset of the former. Indeed, as already explained, a collocation and concordance search on COCA demonstrates that the word “information” is often modified by words connoting veracity, such as “accurate.”

 In addition to MCL 780.702 and MCL 750.157, discussed subsequently in the main text of this opinion, see, e.g., MCL 750.453 (“Truthful testimony, evidence, or other truthful information compelled under this section and any information derived directly or indirectly from that truthful testimony, evidence, or other truthful information shall not be used against the witness in a criminal case, except for impeachment purposes or in a prosecution for pequry or otherwise failing to testify or produce evidence as required.”); MCL 29.7(4) *350 (expressly protecting only “truthful testimony” and “truthful information” from being used against a witness); MCL 780.702a(6) (stating that “truthful information” compelled under an order granting immunity may not be used against a witness); MCL 750.125(5) (expressly protecting “truthful information” from being used against a witness); MCL 750.122(2) (stating that paying a witness’s reasonable costs to “testify truthfully or provide truthful information” is not a crime).

 See also MCL 333.17014 (stating that certain informed consent statutes are designed to provide “objective, truthful information”); MCL 400.111b(20) (requiring certain professionals to provide “truthful information” about their qualifications).
Other statutes do not modify the word “information” with “truthful,” but still suggest that “information” has no inherent connotation of veracity. See, e.g., MCL 423.452(b) (denying a presumption of actions in good faith to employers who disclose employee information “with a reckless disregard for the truth”); MCL 380.1230b (same quoted language as MCL 423.452(b)); MCL 750.411s(8)(i) (“ ‘Post a message’ means . . . communicating or attempting to . . . communicate information, whether truthful or untruthful, about the victim.”); MCL 449.20 (requiring that “[p]artners shall render on demand true and full information of all things affecting the partnership to any partner or the legal representative of any deceased partner or partner under legal disability”); MCL 449.1305(2) (setting forth the right of limited partners to “[o]btain from the general partners, from time to time, upon reasonable demand . . . true and full information regarding the state of the business and financial condition of the limited partnership”); MCL 324.5507(l)(e) (requiring that a certain application be accompanied by a certification “statfing] that, based on information and belief formed after reasonable inquiry, the statements and information in the application are true, accurate, and complete”); MCL 460.1093(9) (requiring that a certain report “shall be accompanied by an affidavit from a knowledgeable official of the customer that the information in the report is true and correct to the best of the official’s knowledge and belief’).
Correspondingly, as Judge Wilder observed in dissent, the Legislature has frequently modified “information” with the adjectives “misleading” or “inaccurate” when the Legislature only intended to reach false information. See, e.g., MCL 769.34(10); MCL 750.492a(l); MCL 791.235(l)(b). We agree with Justice Maekman that the use of such modifiers in other statutes does not alone lead to the conclusion that the word “information,” as used in the DLEOA, includes both true and false *351 statements. But the Legislature’s use of these modifiers elsewhere supports our understanding that the word “information” itself connotes nothing with respect to veracity.

 MCL 780.702(3) (emphasis added).

 Compare 1968 PA 289, § 2, with 1999 PA 249, § 2.

 Emphasis added.

 People v McIntire, 461 Mich 147; 599 NW2d 102 (1999).

 MCL 767.6, as amended by 1951 PA 276.

 McIntire, 461 Mich at 164 (citation and quotation marks omitted).

 Id. at 153 (citation and quotation marks omitted).

 See, e.g., Farrington v Total Petroleum, Inc, 442 Mich 201, 210; 501 NW2d 76 (1993) (“Courts cannot assume that the Legislature inadvertently omitted from one statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there.”); Paselli v Utley, 286 Mich 638, 643; 282 NW 849 (1938) (“This court cannot write into the statutes provisions that the legislature has not seen fit to enact.”).
In his dissent, Justice Makkman questions our reliance on Mclntire by suggesting that Mclntire has since been rendered moot. We find no support for that suggestion. To the contrary, McIntire guides our decision by interpreting a similar statute. The McIntire Court recognized—as we do here—that a court is not free to rewrite a statute because the end result may be subjectively unpalatable and that “the object of judicial statutory construction is not to determine whether there are valid alternative policy choices that the Legislature may or *353 should have chosen, but to determine from the text of the statute the policy choice the Legislature actually made.” McIntire, 461 Mich at 167 (citation and quotation marks omitted). The Mclntire Court concluded that the statutory language at issue in that case unambiguously stated the Legislature’s actual policy choice and that there was no basis to disregard that choice “to further policy concerns that [a court], but apparently not the Legislature, prefers.” Id. at 160 (citation and quotation marks omitted). We are still obligated to give weight to the Legislature’s decision not to modify “information” in the DLEOA with “truthful” or to impose any other veracity-based limitation on the scope of the statute’s protections.
This Court’s decision in Mclntire coupled with the unique history of immunity statutes in Michigan leads us to the conclusion that the DLEOA protects both true and false statements. The dissent would have us abandon Mclntire in favor of the federal rule articulated in Glichstein v United States, 222 US 139, 142; 32 S Ct 71; 66 L Ed 128 (1911). Whatever the merits of that rule, the existence of McIntire at the time the DLEOA was enacted provides us great insight into the intent of the Legislature. Accordingly, we see no reason to abandon Mclntire now. See Robinson v Detroit, 462 Mich 439; 613 NW2d 307 (2000). We nonetheless recognize that Mclntire guides us in the limited and unique area of immunity-related statutes, and we express no opinion whether other statutes that incorporate the word “information” in an entirely different context outside that of immunity and compulsory statements might be interpreted differently.

 In urging against this result, the prosecution contends that the DLEOA’s legislative history makes clear that MCL 15.393 was meant to codify nothing more than the Fifth Amendment protections recognized by Garrity and its federal progeny—a contention Justice Markman also notes. We find this line of argument unavailing for several reasons. First, for the reasons already discussed, the plain language of MCL 15.393 controls our analysis and belies this interpretation, making clear that the statute’s protections extend beyond those presently guaranteed by the Fifth Amendment. We see no need or place for legislative history in this analysis. Second, the materials offered by the prosecution are legislative analyses, which this Court has recognized to be of little use in discerning the intent of the Legislature. See Johnson v Recca, 492 Mich 169, 188; 821 NW2d 520 (2012) (stating that a house legislative *354 analysis, which is a staff-prepared summary of the law, is entitled to little judicial consideration in the construction of statutes); Frank W Lynch & Cov Flex Technologies, Inc, 463 Mich 578, 587; 624 NW2d 180 (2001) (“[A] legislative analysis is a feeble indicator of legislative intent. . ..”); In re Certified Question from the United States Court of Appeals for the Sixth Circuit, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003) (“In no way can a ‘legislative analysis’ be said to officially summarize the intentions of those who have been designated by the Constitution to be participants in this legislative process, the members of the House and Senate and the Governor. For that reason, legislative analyses should be accorded very little significance by courts when construing a statute.”). And third, these analyses offer no direct insight into the precise scope of the intended codification of Garrity, or whether MCL 15.393 was meant to afford protection beyond it. Indeed, it is not even clear whether the drafters of the analyses believed the statute was meant to codify Garrity as its rule had been interpreted by the Michigan Court of Appeals in Allen—which would render defendants’ statements constitutionally protected—or instead to codify Garrity as its rule had been developed by subsequent federal caselaw—which would afford no constitutional protection to those statements. Simply put, we see nothing of interpretive use in these materials or of persuasive value in the prosecution’s arguments based on them.
Although the parties did not address the question, Justice Makkman also offers another interpretive avenue for constraining the scope of the DLEOA’s protections to those constitutionally provided under Garrity and its federal progeny: he suggests that “truthful” need not be included with “information” in the DLEOA because, as federal Fifth Amendment jurisprudence has held, an individual cannot be compelled to lie; accordingly, even if a lie can be deemed “information,” lies cannot be considered an “involuntary statement” or “compelled” within the meaning of the DLEOA. While we recognize the intuitive appeal of this reasoning, we find ourselves unable to square it with Mclntire and the numerous instances, previously cited in this opinion, in which the Legislature has described “information” as both “truthful” and “compelled.” See MCL 780.702(3) (referring to “[t]ruthful testimony or other truthful information compelled under the order granting immunity”); MCL 750.157 (referring to “[tjruthful testimony, evidence, or other truthful information compelled under this section”). If nothing else, these instances make clear that, by the time the DLEOA was enacted, the Legislature was not assuming that the term “compelled” would be inherently limited to its Fifth Amendment meaning or would express an intent to reach only truthful statements. Nor do we discern such a limitation in the term itself or view false statements as necessarily *355 voluntary. Indeed, in Allen, the Court of Appeals rejected the contention that a false statement cannot be voluntary by observing that “what one reveals as a result of a waiver is of no import in determining whether the waiver was voluntary or coerced.” Allen, 15 Mich App at 393. In this case, there is no question that, but for the threat of termination, defendants in this case would have remained silent. Again, the advice of rights form presented to defendants by the Detroit Police Department stated, “If I refuse ... to answer questions . . . , I will be subject to departmental charges which could result in my dismissal from the police department,” and “[i]f I do answer . . . , neither my statements or any information or evidence which is gained by reason of such statements can be used against my [sic] in any subsequent criminal proceeding.”

 Hughes, 306 Mich App at 130.

 Post at 385. In so stating, Justice Markman implicitly suggests that our interpretation of the DLEOA renders an absurd result. A similar argument was raised in Mclntire and was rejected by this Court.

 McIntire, 461 Mich at 153 (citation and quotation marks omitted; alterations in original).

 As noted earlier, the DLEOA not only prohibits the use of involuntary statements in criminal proceedings, but also restricts their public disclosure. Complications could arise from a nondisclosure rale that turns on a determination of truth; who, for instance, would decide whether an officer’s statement was truthful? The DLEOA provides no insight into how such a rule might be implemented.

 Allen, 15 Mich App at 393.

 We also note that the DLEOA does not purport to wholly foreclose criminal prosecution for an officer’s conduct that has been the subject of internal inquiry; it simply prohibits using in that prosecution the officer’s “involuntary statement” and “any information derived” therefrom. MCL 15.393.

 McIntire, 461 Mich at 159.

 Id. (quotation marks and citations omitted).