*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JOAN HIGGINS and RICHARD HIGGINS,

Plaintiffs-Appellees,

v

LARISA TRAILL, M.D., EMERGENCY
MEDICAL SPECIALISTS, PC, and ST. JOHN
PROVIDENCE HEALTH SYSTEM,

Defendants,

and

DAVID FRY, M.D., DIAGNOSTIC
RADIOLOGY CONSULTANTS, PC, and ST.
JOHN MACOMB-OAKLAND HOSPITAL,

Defendants-Appellants.

UNPUBLISHED
July 30, 2019

No. 343664
Macomb Circuit Court
LC No. 2016-001382-NH

Before: M. J. KELLY, P.J., and MARKEY and GLEICHER, JJ.

GLEICHER, J. (*concurring*).

Plaintiffs Joan and Richard Higgins contend that defendant David Fry, M.D., negligently misread a CT angiogram of Joan Higgins' brain. Two expert witnesses provided deposition testimony supporting their claim: Drs. Joel Meyer and Gregg Zoarski. Drs. Meyer and Zoarski are board certified in diagnostic radiology, and so is Dr. Fry. Drs. Meyer and Zoarski also have certificates of added qualification in neuroradiology. Dr. Fry does not.

Relying on *Woodard v Custer*, 476 Mich 545; 719 NW2d 842 (2006), Dr. Fry asserts that the relevant specialty in this case is diagnostic radiology. Because the two experts have certificates of added qualification in neuroradiology and devote a majority of their professional time to practicing neuroradiology, they may not testify to the appropriate standard of care, Dr. Fry insists.

Guided by this Court's decision in *Reeves v Carson City Hosp (On Remand)*, 274 Mich App 622, 629-630; 736 NW2d 284 (2007), the majority holds that the relevant specialty is neuroradiology and not diagnostic radiology. Since Dr. Fry was practicing neuroradiology when he interpreted the CT angiogram, the majority finds the experts qualified under MCL 600.2169(1)(b).

I concur that Drs. Zoarski and Meyer qualify as standard of care experts. Drs. Fry, Meyer and Zoarski are all board certified in diagnostic radiology. If Dr. Fry is correct and diagnostic radiology is the relevant specialty under MCL 600.2169, a textual reading of the statute dictates that Drs. Meyer and Zoarski must be permitted to testify regarding the standard of care. I acknowledge that my analysis collides with the Supreme Court's opinion in *Woodard*. I respectfully suggest that reconsideration of *Woodard* is in order.

## I. AN OVERVIEW OF *WOODARD*'S TEXTUAL ERRORS

Dr. Fry's argument rests on the following three principles introduced in *Woodard*: (1) a medical subspecialty is the same thing as a specialty under MCL 600.2169(1)(a); (2) a certificate of added qualification is the same thing as board certification in a specialty, and (3) a specialist can devote the majority of his or her professional time only to a single specialty. The words of the statute, combined with a small dose of logic, refute all three of these judge-created precepts.

The Legislature enacted MCL 600.2169(1) to limit the discretion of trial courts in determining whether a medical malpractice expert is qualified to testify. *McDougall v Schanz*, 461 Mich 15, 25; 597 NW2d 148 (1999). The portion of the statute relevant to this case provides:

(1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:

(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

(b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

The plain language of subsection (1)(a) links an expert's qualification to his or her professional credentials. For specialists, board certification is the focal point of the statute's

credentialing prong. Subsection (1)(b) centers on actual clinical practice. In a case involving a specialist, an expert must have devoted a majority of his or her professional time to the active clinical practice of the same specialty during a relevant time period. MCL 600.2169(1)(b)(*i*). Like the credential prong, the practice prong hinges on an expert's "specialty."

The terms "board certified" and "specialty" figure prominently in the statute. I believe that *Woodard* created definitions for these terms out of thin air, and that the definitions are inconsistent with the words used by the Legislature. In my view, board certification means board certification, and specialty means specialty. Board certification is not the same thing as certification with additional qualifications. A specialty is not a subspecialty. Respectfully, the *Woodard* majority abandoned a textual approach when it conflated board certification with attainment of a certificate of added qualification. It committed the same error by announcing that specialties and subspecialties are identical concepts. These mistakes paved the way for *Woodard*'s central error: that a physician can practice only one specialty at a time.

## II. *WOODARD* VERSUS THE TEXT OF MCL 600.2192(1)(a)

Subsection (1)(a), the statute's credentialing prong, provides: "[I]f the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty." MCL 600.2169(1)(a). This sentence references "a specialist," "that specialty," and "board certification." Alternatively stated, it provides that when a defendant is a "board certified" "specialist," the plaintiff's expert must be a "specialist" "board certified" in the same "specialty."

None of these terms were defined by the Legislature, but they are not difficult to parse. *Woodard* defined the word "specialty" by combining the *Dorland's Illustrated Medical Dictionary* definition of "specialist," which incorporates board certification in the concept, with the portion of MCL 600.2961(1)(a) referencing defendant physicians who are "specialists" and "board certified." "[A] 'specialty,' " the Court adduced, "is a particular branch of medicine or surgery in which one can potentially become board certified." *Woodard*, 476 Mich at 561.

So far, so good. The Legislature paired the terms "specialist" and "board certified," so thinking about board certification (or potential board certification) as an essential attribute of being a specialist makes sense. And when it comes to specialists, the Legislature tied expert qualification to matching board certification. It logically follows that in a case involving the standard of care expected of a board-certified specialist, a standard-of-care expert must be board certified in the same specialty.

The *Woodard* majority fell off the textual rails, however, by fashioning its own definition of the term "board certification," and then deciding that the words "specialty" and subspecialty" mean exactly the same thing. I submit that the term "board certified" is unambiguous and well understood, and so is the term "specialty." The meanings assigned those terms by the *Woodard* majority, however, are the majority's own creations. They are untethered to the text, do not derive from a dictionary, and do not even relate to any rule of statutory construction. I suggest that the plain meanings of the terms should control the statute's interpretation and application.

## A. Board Certification Means Board Certification

In *Woodard*, 476 Mich at 564-565, the majority decided that "board certification" encompasses both certification by a board recognized by the American Board of Medical Specialties, *and* the possession of a "certificate of added qualification." According to *Woodard*, board certification and a possession of a certificate of added qualification are identical concepts. *Id*. at 565.

But having a board certification is *not* the same thing as having a certificate of special qualification. Attaining board certification is a process separate and distinct from obtaining a certificate of added qualification. Those who earn certificates of added qualification have training above and beyond that required for board certification. That is why Dr. Fry objects so strenuously to plaintiffs' experts; in Dr. Fry's view, plaintiffs' experts are overqualified. *Woodard* supports Dr. Fry. It holds that if a defendant physician has received *any* official certification of professional competence from a medical organization, "the plaintiff's expert witness must also have obtained the same certification in order to be qualified to testify concerning the appropriate standard of practice or care." *Id*. at 564. Conversely, as defendants argue here, if a defendant lacks a certificate of added qualification, an expert possessing such a certificate may not testify.

This approach to qualifying an expert might make sense. But the Legislature did not embrace it when it enacted MCL 600.2169. Instead, MCL 600.2169(1) states that an expert's qualification rises or falls on the expert's "board certification." The statute never mentions certificates of added qualification. Certificates of added qualification were not new in 1986, when the statute took effect. They had been earned by specialists for decades before that date, and no doubt the Legislature was aware that they existed. *Woodard* assumes that when drafting MCL 600.2169, the Legislature overlooked this highly relevant, discrete professional achievement. I submit that fidelity to the text requires that we avoid changing the meaning of an ambiguous term. "The words of the statute provide the best evidence of legislative intent and the policy choices made by the Legislature. Our role as members of the judiciary is not to second-guess those policy decisions or to change the words of a statute in order to reach a different result." *People v Harris*, 499 Mich 332, 345; 885 NW2d 832 (2016). The Legislature did not inadvertently overlook the existence of certificates of added qualification: "The Court may not assume that the Legislature inadvertently made use of one word or phrase instead of another." *Robinson v Detroit*, 462 Mich 439, 459; 613 NW2d 307 (2000). Rather, it decided that board certification, and board certification alone, establishes the first indicator of expert qualification.

According to the American Board of Medical Specialties, there are 24 medical specialty boards. American Board of Medical Specialties, ABMS Guide to Medical Specialties (2019), p 5, available at <https://www.abms.org/media/194925/abms-guide-to-medical-specialties-2019.pdf> (accessed July 22, 2019). Radiology is one such board. Neuroradiology is not. A board-certified radiologist can obtain a certificate of added qualification in neuroradiology. But the radiologist with a certificate of added qualification remains board certified in one discipline—radiology. In *Woodard*, the Supreme Court conflated these two different terms. Just as a Master's degree in History reflects a different level of achievement than does a Ph.D. in the same "specialty," a board-certified physician has different training than one who has earned a

certificate of added qualification. The physicians involved in this case know the difference. As stated by Dr. Meyer:

> *Q.* I believe you testified there is no separate Board certification for neuroradiologists relative to diagnostic radiology; correct?
>
> *A.* There is only the certificate of added qualifications, but it's not a separate Board certification. That's correct.

The Supreme Court once knew the difference, too. A mere two years before deciding *Woodard*, the Supreme Court relied on the *difference* between board certification and a certificate of added qualification to decide that a plaintiff's expert was unqualified to testify under § 2169(1). In *Halloran v Bhan*, 470 Mich 572, 575; 683 NW2d 129 (2004), the defendant was board certified in internal medicine and had a certificate of added qualification in critical care medicine. The plaintiff's proposed expert was board certified in anesthesiology and had a certificate of added qualification in critical care medicine. *Id*. The Supreme Court observed that the parties in that case did not "dispute that the subspecialty certification is not a 'board certification' for the purpose of the statute." *Id*. The Court's holding was consistent with the parties' understanding of the term—"Because plaintiff's expert witness did not share the same board certification as the defendant doctor, we reverse the decision of the Court of Appeals that held to the contrary and reinstate the circuit court's order granting defendants' motion to strike." *Id*. at 574-575.

*Woodard* implicitly overruled *Halloran*, serving as a "reminder that activism comes in all guises, including so-called textualism." *McCormick v Carrier*, 487 Mich 180, 209; 795 NW2d 517 (2010) (quotation marks and citation omitted). Why was *Halloran* so easily overlooked in *Woodard*? Part of the reason is that the *Woodard* majority became entangled in two additional parts of the statute: the definition of specialty and the meaning of subsection 2169(1)(b).

### B. Specialist and Subspecialists: Different Words, Different Definitions

According to *Woodard*, 476 Mich at 562, "[a] subspecialty, although a more particularized specialty, is nevertheless a specialty." Calling something by another name does not transform its true meaning. The two terms are not synonymous. All doctors know that a "specialty" is *not* a subspecialty, and I am certain that the Legislature knew it, too. Physicians who wish to be known as subspecialists must devote extra time and effort to earning that description. Generally, a certificate of added qualification transforms a specialist into a subspecialist. In medicine, a subspecialty is a narrower field within a specialty. Dr. Meyer explained:

> *Q.* I understand you are a neuroradiologist; is that true?
>
> *A.* Yes.
>
> *Q.* You are Board certified in diagnostic radiology?
>
> *A.* Yes.

*Q.* And then you obtained a CAQ in neuroradiology?

*A.* Yes.

*Q.* And I understand that you did your - - well, neuroradiology is a subspecialty of diagnostic radiology; correct?

*A.* Yes.

*Q.* And it's a subspecialty in which you can obtain a CAQ or Board certification; correct?

*A.* It's not a separate Board at this stage in neuroradiology. It's just a certificate of added qualifications to the primary Board.

*Q.* You had - - what did you have to do to get your CAQ?

*A.* I needed to qualify to take the exam. I qualified by having done a fellowship in neuroradiology, and then by practicing greater than 50 percent of the time in neuroradiology for the three years prior to a CAQ being instituted after I finished my training.

The American Board of Radiology also knows the difference between a specialist and a subspecialist. On its website, the Board declares: "Subspecialty initial certification in the areas below is available for candidates who are initially certified in diagnostic radiology. Specialty certification is required to earn and maintain subspecialty certification." Neuroradiology is one of the "areas below." American Board of Radiology, Subspecialties, available at <https://www.theabr.org/diagnostic-radiology/subspecialties#neuro> (accessed July 22, 2019).

The inaccurate and nontextual blending of the terms specialty and subspecialty blights the balance of *Woodard*'s analysis.

III. *WOODARD* VERSUS THE TEXT OF MCL 600.2169(1)(b)

I now turn to the section of the statute at the center of defendant's argument, § 2169(1)(b). Here, too, *Woodard* has engrafted language into the statute going well beyond and, in my view, contradicting the Legislature's choices.

"[T]he specialty requirement is tied to the occurrence of the alleged malpractice," *Woodard* decreed. *Woodard*, 476 Mich at 559 (quotation marks and citation omitted). Subsection 2169(1)(b) requires that an expert devote "the *majority*" of his or her professional time to the practice of "the same specialty," the Court reasoned. *Woodard*, 476 Mich at 559-560. *Woodard* holds:

[T]he plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the specialty that the defendant

-6-

physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty. [*Id*. at 566.]

And "one cannot devote a 'majority' of one's professional time to more than one specialty," *Woodard* declares. *Id*.

With this, *Woodard* adopted a zero-sum proposition: a physician can practice only one specialty for the majority of his or her time, and the expert must match that specialty. The singular-specialty-practice construct is at odds with the text, not to mention the realities of modern medicine. This case illustrates the flaws inherent in *Woodard*'s approach.

Dr. Fry argues that when he interpreted the CT angiogram of Joan Higgins' brain, he was practicing diagnostic radiology. The interpretation of CT angiograms of the brain falls well within the competence of a diagnostic radiologist, Dr. Fry claims. In Dr. Fry's estimation, diagnostic radiology is *the* relevant specialty.

If Dr. Fry was practicing diagnostic radiology when he interpreted the CT angiogram of Joan Higgins' brain, it inescapably follows that Drs. Zoarski and Meyer practice diagnostic radiology when *they* interpret CT angiograms of the brain. If the interpretation of a CT angiogram is within the purview of a diagnostic radiologist, as Dr. Fry contends, and Drs. Zoarski and Meyer are both board certified in diagnostic radiology, they, too, practice diagnostic radiology when they interpret CT angiograms of the brain.

*Woodard* holds that only one specialty may be practiced at a time, and only one specialty may be matched. *Id*. This case demonstrates that the "one specialty" concept is incompatible with real life. Obviously, Drs. Meyer and Zoarski bring all of their training and experience to bear when they interpret CT angiograms, including their training and experience as subspecialists in neuroradiology. Nevertheless, I submit that under § 2169(1)(b), they are qualified to testify against Dr. Fry.[1]

MCL 600.2169(1)(b) instructs that to be qualified as a standard-of-care expert, a physician must devote a majority of his or her professional time to the active clinical practice of the "specialty" practiced by a board-certified defendant. If Dr. Fry is correct, that specialty is diagnostic radiology. Diagnostic radiology is the only "*specialty*" that Drs. Zoarski and Meyer practice. In addition to diagnostic radiology, both also practice neuroradiology. But that is a subspecialty, and the statute does not mention subspecialties. Instead, the plain language tells us that only "specialties" count.

If reading CT angiograms of the brain is part of the practice of diagnostic radiology, Drs. Meyer and Zoarski practice diagnostic radiology when they interpret CT angiograms of the

---

[1] Of course, an attorney may always argue that an expert's additional training, or lack thereof, renders his or her opinions less credible. In my view, the Legislature anticipated exactly this when it decided against including certificates of added qualification in any definition of board certification.

brain. Under *Woodard*, a recalculation of their professional time division is in order. This recalculation must be accomplished because *Woodard* dictates that subspecialists like Drs. Meyer and Zoarski can only practice one specialty at a time.

By conflating specialties and subspecialties, *Woodard* forces potential experts to carve their professional time into separate pieces so they can settle on what constitutes a "majority." As this case so aptly demonstrates, this is fool's errand. It makes no sense to balkanize an expert's practice in the manner that *Woodard* dictates, because in reality there is a substantial overlap between the work of specialists and subspecialists. *Woodard* demands bright lines and impenetrable borders based on definitions unsupported by the words of the statute or the realities of life. A return to the text would go far toward remedying this problem.

*Woodard* compels a contorted calculation of which specialty or subspecialty consumes the majority of an expert's time based on the notion that it is possible to practice only one thing at a time. This case undercuts *Woodard*'s central thesis. Both diagnostic radiologists and neuroradiologists interpret CT angiograms of the brain. The content of their practices overlap in this regard, and likely many others.

I join the majority opinion because the result it reaches is consistent with the zero-sum reading of § 2169 advanced in *Woodard*. That approach leads to several absurd propositions, including that a "specialist" can devote a majority of his or her time to practicing only one "specialty." This case involves a radiologic examination of the brain, typical fodder for neuroradiologsts, who routinely review studies of the brain and spinal cord. Neuroradiology, a "specialty" according to *Woodard*, is stripped of its meaning and importance as a medical discipline by a judicial holding that reading a CT angiogram of the brain is actually not neuroradiology, but instead diagnostic radiology. Faced with the obvious overlap between the two "specialties," I agree with the conclusion that Dr. Fry was practicing neuroradiology when he read the study involved in this case.

This *Woodard*-dictated result remains mystifying. Applied here, one consequence is that the universe of expert witnesses qualified to testify does not include Dr. Fry. This result must obtain, *Woodard* tells us, because Dr. Fry does not devote a majority of his professional time to the practice of the most relevant specialty, neuroradiology. This incongruity can be avoided by reexamining *Woodard*. The word "specialty" should be construed to include specialties (more than one specialty), and to exclude subspecialties. In real life, diagnostic radiologists and neuroradiologists review CT angiograms of the brain. Therefore, they are engaged in the same "specialty." Second, because there is obvious overlap in the practices of the two disciplines, it makes sense to conclude that a radiologist practices *both* diagnostic radiology and neuroradiology when he or she interprets a brain or spinal cord study.

As board-certified radiologists, both general (diagnostic) radiologists and neuroradiologists are qualified to interpret CT angiograms. The Legislature understood this when it enacted MCL 600.2169, because it tied qualification to board certification rather than to subspecialization. MCL 600.2169(1)(a) provides that because Dr. Fry is a board-certified specialist in radiology, an expert who is board certified in the same specialty is qualified to testify to the standard of care. Under subsection (1)(b), the expert must have devoted his professional time during the relevant timeframe to "the active clinical practice of" the

defendant's *specialty*.  Drs. Meyer and Zoarski practice the *specialty* of diagnostic radiology and the subspecialty of neuroradiology.  Guided by the words selected by the Legislature rather than extratextual, judicially created definitions, I would hold that they qualify as experts in this case.


/s/ Elizabeth L. Gleicher