*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DARNELL RUSH,

Defendant-Appellant.

UNPUBLISHED
January 13, 2022

No. 353182
Wayne Circuit Court
LC No. 19-004021-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CARLOS THOMAS,

Defendant-Appellant.

No. 353184
Wayne Circuit Court
LC No. 19-005373-01-FC

Before: BOONSTRA, P.J., and CAVANAGH and RIORDAN, JJ.

PER CURIAM.

In these consolidated appeals,[1] defendants Darnell Rush (Rush) and Carlos Thomas (Thomas) appeal by right their convictions, entered after a joint trial before a single jury, of first-degree felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, mutilation of a dead body, MCL 750.160, and possession of a firearm during the commission of a felony, MCL 750.227b. The trial court sentenced Rush to concurrent prison terms of life without parole (LWOP) for the murder conviction, 10 to 60 years for the armed robbery conviction, and 5 to 10 years for the mutilation conviction, and a consecutive two-year term of imprisonment for the

---

[1] See *People v Rush*, unpublished order of the Court of Appeals, entered April 8, 2020 (Docket Nos. 353182 & 353184).

felony-firearm conviction. The court sentenced Thomas as a third-offense habitual offender, MCL 769.11, to concurrent prison terms of LWOP for the murder conviction, 562 to 800 months for the armed robbery conviction, and 5 to 10 years for the mutilation conviction, and a consecutive two-year term of imprisonment for the felony-firearm conviction. We affirm both defendants' convictions and sentences.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendants' convictions arise from their participation with at least three accomplices in the fatal shooting of Christopher Thompson (Thompson) during an armed robbery. Thompson was shot while sitting inside his GMC Yukon that was parked in the driveway of a Detroit home during the early morning hours of January 3, 2018. Demonte Foster (Foster)[2] testified that on the night in question, he observed expensive-looking wheel rims on the tires of Thompson's Yukon, and called another accomplice, Jarrin Larry (Larry),[3] to meet him, saying he wanted to rob "[t]he guy in the truck." Foster testified that he, Thomas, Larry, and two other men, Ralph Scott (Scott)[4] and Jacarta Jennings (Jennings)[5] met near Thompson's vehicle and that Larry was armed with a firearm. Larry, however, denied ever being armed with a firearm during the robbery. Foster testified that Rush, Thomas, and Larry walked toward Thompson's truck to carry out the robbery. However, Larry testified that Rush, Thomas, and Scott were the three men who approached Thompson's vehicle. Both witnesses testified that they heard at least one gunshot and that the group then fled the scene. Both witnesses also testified that, after Thomas expressed concern about possible identification evidence being left at the scene, the group returned to the scene and three of them used gasoline to set Thompson's truck on fire with Thompson still inside. Foster testified that Rush, Thomas, and Larry set the fire; while Larry testified that it was Rush, Thomas, and Scott who did so. An autopsy revealed that Thompson died from two gunshot wounds, one to the neck and one to the chest. Surveillance video collected by police showed three men approach Thompson's truck, although it did not capture any shooting. The recording also showed three men on foot returning a short time later and lighting Thompson's vehicle on fire.[6]

The jury convicted defendants as described. These appeals followed.

---

[2] Foster pleaded guilty to second-degree murder and felony-firearm prior to trial, and testified for the prosecution as a requirement of his plea agreement.

[3] Larry pleaded guilty to armed robbery prior to trial, and testified for the prosecution as a requirement of his plea agreement.

[4] Scott was not charged below and did not testify as a witness at trial.

[5] Jennings was charged, tried, and convicted of first-degree felony murder, armed robbery, mutilation of a dead body, and felony-firearm in separate proceeding. See *People v Jennings*, unpublished per curiam opinion of the Court of Appeals, issued July 2, 2020 (Docket No. 349222).

[6] Vehicles registered to Foster and Jennings were also recorded by nearby security cameras, ultimately leading to their arrests.

## II. DOCKET NO. 353182 (RUSH)

## A. SUFFICIENCY OF THE EVIDENCE/GREAT WEIGHT OF THE EVIDENCE

Rush argues that there was insufficient evidence to support his conviction of first-degree felony murder under an aiding or abetting theory, because there was insufficient evidence that he had the requisite intent. We disagree. We review de novo a challenge to the sufficiency of the evidence. *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015). When determining whether sufficient evidence was presented at trial to support a conviction, this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury's verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

A conviction for first-degree felony murder requires proof that the defendant (1) killed the victim, (2) with the intent to kill, to cause great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of a felony specifically enumerated in MCL 750.316(1)(b).[7] *People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007); *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). The facts and circumstances of a killing may give rise to an inference of malice. *People v Carines*, 460 Mich 750, 759; 597 NW2d 130 (1999). A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm, or from the use of a deadly weapon. *Id*.

At trial, the prosecution's theory of the case was that Rush was guilty of first-degree felony murder as an aider or abettor. A person who aids or abets the commission of a crime may be convicted and punished as if he directly committed the offense. MCL 767.39.

To support a finding that a defendant aided and abetted a crime, the prosecution must show that

> (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant [either] intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement[.] [*People v Izarraras-Placante*, 246 Mich App 490, 496-497; 633 NW2d 18 (2001) (citation omitted)]

---

[7] The underlying felony in this case was armed robbery, an enumerated felony in MCL 750.316(1)(b). The elements of armed robbery are (1) an assault, (2) a felonious taking of property from the victim's presence or person, and (3) while the defendant is armed with a weapon. *People v Smith*, 478 Mich 292, 319; 733 NW2d 351 (2007).

Alternatively, the prosecution may prove an offense on an aiding and abetting theory with proof that "the charged offense was a natural and probable consequence of the commission of the intended offense." *People v Robinson*, 475 Mich 1, 15; 715 NW2d 44 (2006). "Aiding and abetting" describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime. *Carines*, 460 Mich at 757; *People v Rockwell*, 188 Mich App 405, 411-412; 470 NW2d 673 (1991). "The quantum of aid or advice is immaterial as long as it had the effect of inducing the crime." *People v Lawton*, 196 Mich App 341, 352; 492 NW2d 810 (1992). An aider or abettor's state of mind may be inferred from all the facts and circumstances, including a close association between the defendant and the principal, and the defendant's participation in the planning or execution of the crime. *Carines*, 460 Mich at 757; *People v Bennett*, 290 Mich App 465, 474; 802 NW2d 627 (2010).

Viewed in a light most favorable to the prosecution, the evidence was sufficient to show that a member of Rush's group committed the crime of first-degree felony murder by shooting Thompson in the neck and chest, causing his death, as part of the commission of an armed robbery, and that, at the time of Thompson's killing, Rush and the other men intended to rob Thompson. Second, there was sufficient evidence that Rush assisted in Thompson's murder by (1) planning and agreeing with his codefendants to rob Thompson, (2) acting in concert with two of his codefendants, at least one of whom was armed, in approaching Thompson's truck to carry out the robbery, (3) fleeing from the scene with his codefendants after Thompson was shot, leaving Thompson in the truck, and (4) returning to the scene with two of his codefendants and burning Thompson's truck, with Thompson inside, in an effort to avoid detection. See *Carines*, 460 Mich at 757; *People v Bennett*, 290 Mich App 465, 474; 802 NW2d 627 (2010).

Moreover, an aider or abettor is criminally responsible for anything that is fairly within the common enterprise such that one might anticipate its commission should the opportunity arise. *Robinson*, 475 Mich at 9, 15. Rush does not dispute that the evidence was sufficient to show that he knew and intended for the codefendants to commit an armed robbery against Thompson, and that he intended to participate in that robbery. Because Rush agreed to commit a robbery against Thompson, was aware that a firearm was being used to carry out the planned robbery, and voluntarily accompanied his codefendants as they approached Thompson in order to rob him, the evidence, considered together, was sufficient to support a finding that a fatal shooting was a natural and probable consequence of the intended armed robbery. *Id*. Accordingly, the evidence was sufficient to support Rush's conviction of first-degree felony murder under an aiding or abetting theory.

Alternatively, Rush argues that he should receive a new trial because his conviction for first-degree felony murder was against the great weight of the evidence. Again, we disagree. A defendant is required to move for a new trial in the lower court to preserve a claim that his conviction is against the great weight of the evidence. *People v Cameron*, 291 Mich App 599, 617-618; 806 NW2d 371 (2011). Because Rush did not raise this issue in a motion for a new trial, we review this unpreserved claim for plain error affecting Rush's substantial rights. *People v Musser*, 259 Mich App 215, 218; 673 NW2d 800 (2003).

Rush's great-weight argument appears to rest on the premise that there was an "unargued theory of guilt" at trial that he was the one who actually shot Thompson, that the jury could have

based its verdict on this theory, and that, if it did so, the verdict would be against the great weight of the evidence. Apart from Larry's pre-trial statement to police that Rush shot Thompson (which Larry disavowed at trial), there was no testimony or physical evidence presented that Rush actually fired the gun. And as Rush acknowledges, the prosecution did not argue the theory that he was the shooter, actually disavowed that theory at trial, and consistently advanced the theory that Rush was guilty because he aided or abetted the crime of felony murder. Further, as discussed, the evidence established Rush's guilt of felony murder under an aiding or abetting theory. Considering the evidence that Rush agreed with his codefendants to commit a robbery against Thompson, approached Thompson's truck with two of his codefendants, knowing that one was armed with a firearm, and that Thompson was fatally shot during the intended armed robbery, the evidence does not preponderate so heavily against the jury's verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v Lemmon*, 456 Mich 625, 647; 576 NW2d 129 (1998).

## B. MANDATORY LWOP SENTENCE

Rush also argues that, given his age of 21 years at the time of the offense, the imposition of the statutory sentence of mandatory life imprisonment without parole violates the Eighth Amendment because mitigating factors of youth were not considered. We disagree. Rush raised this issue in a motion for resentencing before the trial court, and the issue is therefore preserved. See *People v Clark*, 315 Mich App 219, 223-224; 888 NW2d 309 (2016). We review de novo preserved constitutional issues. *People v Harris*, 499 Mich 332, 342; 885 NW2d 832 (2016).

"The Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16,[8] whereas the United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII.[9]" *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011). "If a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *Id*. (citation and quotation marks omitted). Whether a penalty or sentence imposed against a defendant can be considered cruel or unusual is to be determined by a three-pronged test including: "(1) the severity of the sentence imposed and the gravity of the offense, (2) a comparison of the penalty to penalties for other crimes under Michigan law, and (3) a comparison between Michigan's penalty and penalties imposed for the same offense in other states." *Id*. (citation omitted).

Under MCL 750.316(1), unless the person was less than 18 years of age at the time of committing the offense, a person who is convicted of first-degree murder, including felony murder, "shall be punished by imprisonment for life without eligibility for parole." Rush, who was 21 years old at the time of Thompson's murder, contends that the statutorily-mandated sentence constitutes cruel and unusual punishment in violation of the federal constitution because the principles cited by the United States Supreme Court in *Miller v Alabama*, 567 US 460; 132 S Ct

---

[8] The Michigan Constitution provides that "cruel or unusual punishment shall not be inflicted[.]" Const 1963, art 1, § 16.

[9] The United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." US Const, Am VIII.

2455; 183 L Ed 2d 407 (2012), for prohibiting mandatory life sentences without parole for juvenile offenders apply in his case. We disagree.

Rush cites nonbinding secondary authority and scientific research suggesting that the same hallmarks of immaturity that mitigate against mandatory life without parole sentences for juveniles continue to affect young adults, whose brains remain in developmental stages well into their twenties. Regardless of the accuracy of these authorities, the *Miller* Court's prohibition against mandatory life without parole sentences for juveniles rested on caselaw that recognized that the attainment of the age of majority (i.e., 18 years of age) is significant in American society and its criminal justice system. In particular, the Court explained as follows in *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005):

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. [*Id*. at 574.]

Rush has not established that the trial court's failure to set aside this well-accepted distinction was error.

Rush also contends that an LWOP sentence under MCL 750.316(1) violates the state constitutional prohibition against cruel or unusual punishment. Our Michigan Supreme Court has previously concluded otherwise. *People v Hall*, 396 Mich 650, 657-658; 242 NW2d 377 (1976). Even if this Court found Rush's arguments persuasive, *Hall* remains binding authority on this point. Consequently, Rush has not established that he is entitled to resentencing on his felony-murder conviction at this time.[10] [11]

---

[10] We note that our Supreme Court has granted oral argument on the application for leave to appeal in one of the two consolidated cases considered by this Court in *People v Harris*, unpublished opinion per curiam of the Court of Appeals, issued August 13, 2020 (Docket Nos. 346586, 346587). See *People v Parks*, ___ Mich ___; 964 NW2d 361 (2021). The Supreme Court has directed the parties to "address whether the United States Supreme Court's decisions in *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 LEd2d 599 (2016), should be applied to defendants who are over 17 years old at the time they commit a crime and who are convicted of murder and sentenced to mandatory life without parole, under the Eighth Amendment to the United States Constitution or Const 1963, art 1, § 16, or both." *Id*. We decline to speculate on the outcome of *Parks* or its effects on Davis's claims for resentencing, and make our determination based only the current state of the law.

[11] Shortly before his appeal was to be heard, and a year and nine months after filing his claim of appeal, Rush filed a motion with this court seeking endorsement for oral argument and to file a

## II. DOCKET NO. 353184 (THOMAS)

### A. SUFFICIENCY OF THE EVIDENCE - FIRST-DEGREE FELONY MURDER

Thomas also argues that the evidence was insufficient to support his conviction for felony murder under an aiding or abetting theory, because the prosecution failed to present sufficient evidence of his intent to kill. We disagree.

Again, we review de novo a challenge to the sufficiency of the evidence. *Bailey*, 310 Mich App at 713. When ascertaining whether sufficient evidence was presented at trial to support a conviction, this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational tier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *Reese*, 491 Mich at 139. "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury's verdict." *Nowack*, 462 Mich at 400.

At trial, as with Rush, the prosecution advanced the theory that Thomas was guilty of first-degree felony murder as an aider or abettor. Viewed in a light most favorable to the prosecution, the evidence was sufficient to show that a member of Thomas's group committed the crime of first-degree felony murder by shooting Thompson in the neck and chest, causing his death, as part of the commission of an armed robbery, and that, at the time of Thompson's killing, Thomas and his group intended to rob Thompson. There was also sufficient evidence that Thomas assisted in Thompson's murder by (1) planning and agreeing with his codefendants to rob Thompson, (2) acting in concert with two of his codefendants—one of whom was armed with a firearm—in approaching Thompson's truck to carry out the robbery, (3) fleeing from the scene with his codefendants after Thompson was shot, leaving Thompson in the truck, (4) expressing concern about having left identification evidence at the scene, and (5) returning to the scene with two of his codefendants and burning Thompson's truck, with Thompson inside, in an effort to avoid detection. See *Carines*, 460 Mich at 757; *People v Bennett*, 290 Mich App 465, 474; 802 NW2d 627 (2010).

Moreover, again, an aider or abettor is criminally responsible for anything that is fairly within the common enterprise such that one might anticipate its commission should the opportunity arise. *Robinson*, 475 Mich at 9, 15. Thomas does not dispute on appeal that the evidence was sufficient to show that he knew and intended to participate in the armed robbery of Thompson. Because Thomas agreed to commit a robbery against Thompson, was aware that a firearm was being used to carry out the planned robbery, and voluntarily accompanied his codefendants as they approached Thompson in order to rob him, this evidence, considered together, was sufficient to

---

supplemental brief under Supreme Court Administrative Order No. 2004-6, Standard 4. This Court granted the motion for oral argument, but denied the motion to file a Standard 4 brief raising several additional issues at this late hour. See *People v Rush*, unpublished order of the Court of Appeals, issued ___ __, 2021 (Docket No. 353182). In reviewing Rush's proposed Standard 4 brief, we were not persuaded that any of the alleged errors Rush identified were errors requiring reversal. This Court also denied Rush's motion for reconsideration of our denial. See *People v Rush*, unpublished order of the Court of Appeals, issued ___ __, 2021 (Docket No. 353182).

support a finding that a fatal shooting was a natural and probable consequence of the intended common enterprise of armed robbery. *Id.*

In his brief on appeal, Thomas suggests that the prosecution failed to present sufficient evidence of his identity as one of the participants in the robbery, noting that, in contrast to several of the other men involved, there were no phone records placing him at the crime scene or showing that he was in contact with any of his codefendants at the time of the crimes. To the extent that he raises a sufficiency challenge to the evidence of his identity as a perpetrator, we disagree.

Identity is an essential element in a criminal prosecution, *People v Oliphant*, 399 Mich 472, 489; 250 NW2d 443 (1976), and the prosecution must prove the identity of the defendant as the perpetrator of a charged offense beyond a reasonable doubt. *People v Kern*, 6 Mich App 406, 409-410; 149 NW2d 216 (1967). Positive identification by a witness or circumstantial evidence and reasonable inferences arising from it may be sufficient to support a conviction of a crime. *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000); *Nowack*, 462 Mich at 400. The credibility of identification testimony is for the trier of fact to resolve and this Court will not resolve it anew. *Id.*

Although they differed as to the identity of the third man, Foster and Larry consistently identified Thomas as one of the three participants who approached Thompson's truck to commit the robbery, as well as one of the participants who returned to the crime scene to burn Thompson's vehicle with Thompson still inside. These witnesses' testimony, if believed, was sufficient to establish that Thomas was a participant in the charged crimes. *Davis*, 241 Mich App at 700. The jury was free to believe or disbelieve all or any portion of the witnesses' testimony, and this Court "will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008).

Accordingly, the evidence was sufficient to support Thomas's conviction of first-degree felony murder under an aiding or abetting theory.

### B. PROSECUTORIAL ERROR

Next, Thomas argues that the prosecution misstated the law of aiding or abetting during closing arguments when it repeatedly argued that each person who gave any assistance "was the shooter," without regard to the required intent for felony murder. Again, we disagree. "In order to preserve an issue of prosecutorial misconduct,[12] a defendant must contemporaneously object and request a curative instruction." *Bennett*, 290 Mich App at 475. Thomas did not object to the

---

[12] This Court explained in *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015), that the term "prosecutorial misconduct" has become a term of art used to describe any error that has been committed by the prosecution. The *Cooper* Court concluded that claims of inadvertent error by the prosecution are "better and more fairly presented as claims of 'prosecutorial error,' with only the most extreme cases rising to the level of 'prosecutorial misconduct[,]' " such as those actions that are fraudulent or that violate the Michigan Rules of Professional Conduct. *Id.* For that reason, we will refer to defendant's claims of "prosecutorial misconduct" as "prosecutorial error."

challenged comments at trial. Therefore, this issue is unpreserved and reviewed for plain error affecting Thomas's substantial rights. *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). We will not reverse if the alleged prejudicial effect of the prosecution's conduct could have been cured by a timely instruction. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001).

The prosecution may argue the evidence and all reasonable inferences that arise from the evidence in relationship to its theory of the case, and it need not state its inferences in the blandest possible language. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995); *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). However, "[a] prosecutor's clear misstatement of the law that remains uncorrected may deprive a defendant of a fair trial." *People v Grayer*, 252 Mich App 349, 357; 651 NW2d 818 (2002).

Viewing the challenged remarks in context, it is apparent that the prosecution focused on what it perceived as a critical element of its aiding or abetting theory, namely, that the amount of aid or advice is immaterial as long as it had the effect of inducing the crime. In fact, the prosecution told the jury that it was "spending a lot of time on this because you must understand, any assistance whatsoever means that under the eyes of the law with the instructions that you've agreed to follow, under the eyes of the law any assistance whatsoever means that you are held as equally as responsible as the actual shooter, okay." And contrary to Thomas's argument, the prosecution did not disregard the intent element of felony murder; in fact, the prosecution later explicitly stated that to be convicted, the jury had to find that defendants had the intent to kill, the intent to do great bodily harm, or "knowingly created a very high risk of death or great bodily harm," while arguing that the defendants in this case knowingly created a very high risk of death or great bodily harm because "[w]hen you go up to somebody with a gun to perform an armed robbery you know what might happen, the person might be shot and killed." The prosecution did not argue that it was not required to prove the necessary intent to kill. Accordingly, viewed in context, the prosecution did not misstate the law, and there was no plain error. *Roscoe*, 303 Mich App at 648.

Furthermore, even assuming the prosecution did misstate the law, an erroneous legal argument can be cured if the jury is correctly instructed on the law. *Grayer*, 252 Mich App at 357. In this case, before the presentation of any evidence, the trial court instructed the jury that the court was responsible for instructing on the law, and that the jurors must accept the law as given to them by the court. Before closing arguments, in its final instructions, the trial court instructed the jury that the lawyers' comments are not evidence, and reminded the jurors of their oath to return "a true and just verdict based only on the evidence and [the court's] instructions on the law." The court also instructed, "It is my duty to instruct you on the law. You must take the law as I give it to you. If a lawyer says something different about the law follow what I say." The court reiterated, "your job is . . . to apply the law as I give it to you[.]" The court thereafter accurately instructed the jury on aiding or abetting and first-degree felony murder. Thomas does not dispute that the trial court properly instructed the jury in this regard. Jurors are presumed to have followed their instructions,

*People v Breidenbach*, 489 Mich 1, 13; 798 NW2d 738 (2011), and Thomas has not provided any basis for concluding that the jurors failed to do so in this case.[13]

## C. STANDARD 4 BRIEF

Thomas raises numerous additional issues in his Standard 4 brief,[14] none of which have merit.[15]

### 1. INEFFECTIVE ASSISTANCE OF COUNSEL

Thomas raises several claims of ineffective assistance of counsel. Because Thomas did not raise these claims in an appropriate motion or request for an evidentiary hearing in the trial court, our review is limited to mistakes apparent from the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). "Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Solloway*, 316 Mich App

---

[13] Thomas suggests that the trial court's final instructions were inadequate to cure the error in the prosecutor's closing argument because they were given *before* closing arguments. Again, viewed in context, the prosecutor's argument did not misstate the law. Furthermore, MCR 2.513(N)(1) provides, in pertinent part: "After closing arguments are made or waived, the court must orally instruct the jury as required and appropriate, *but at the discretion of the court, and on notice to the parties, the court may orally instruct the jury before the parties make closing arguments.*" (Emphasis added.) In this case, the trial court gave notice to the parties that it would instruct the jury before closing arguments, and there were no objections. There is no reason to conclude that the mere fact that trial court instructed the jury before closing arguments, which it was allowed to do, means that the jury did not follow the court's instructions. The trial court also provided the jury with a copy of the instructions to use during deliberations. Again, jurors are presumed to have followed their instructions, *Breidenbach*, 489 Mich at 13, and the timing of the trial court's instructions in this case is not a basis for concluding that they failed to do so.

[14] A supplemental appellate brief filed *in propria persona* by a criminal defendant under Supreme Court Administrative Order No. 2004-6, Standard 4.

[15] In his Standard 4 brief, Thomas raises an additional claim of prosecutorial error that he did not present in his Statement of Issues. Because it was not raised in his statement of the questions presented, Thomas has failed to properly present it for this Court's consideration, and we decline to consider it. MCR 7.212(C)(5); *Unger*, 278 Mich App at 262. It is, in any event, also without merit. Thomas simply makes a general argument, with no specific citation to the record, that the prosecutor impermissibly vouched for Foster's credibility by arguing, in closing argument, that Foster was being truthful. But the prosecutor did not refer to any special knowledge, beyond the evidence presented at trial, to argue that Foster was truthful. The prosecutor's argument was responsive to the evidence and to the defense theory presented at trial and, viewed in context, was not improper. The trial court instructed the jury that the lawyers' statements and arguments are not evidence, that the jurors were the sole judges of witness credibility, and that the jury was to follow the court's instructions.

174, 187; 891 NW2d 255 (2016). "To demonstrate ineffective assistance of counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness under prevailing professional norms and that this performance caused him or her prejudice." *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013) (citation omitted). "To demonstrate prejudice, a defendant must show the probability that, but for counsel's errors, the result of the proceedings would have been different." *Id*. "A defendant must meet a heavy burden to overcome the presumption that counsel employed effective trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).

### a. FAILURE TO FILE A MOTION FOR SEVERANCE

Thomas first argues that defense counsel was ineffective for not requesting severance of his and Rush's trial. We disagree. "The decision to try two defendants jointly or separately lies within the discretion of the trial court, and that decision will not be overturned absent an abuse of that discretion." *People v Furline*, 505 Mich 16, 20; 949 NW2d 666 (2020). "There is no absolute right to separate trials, and in fact, strong policy favors joint trials in the interest of justice, judicial economy, and administration." *People v Bosca*, 310 Mich App 1, 44; 871 NW2d 307 (2015) (citation and quotation marks omitted). Severance is mandated under MCR 6.121(C) only when a defendant demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice. *Furline*, 505 Mich at 21, citing *People v Hana*, 447 Mich 325, 344-345; 524 NW2d 682 (1994), amended 447 Mich 1203 (1994). In order to make this showing, a defendant must provide the court with a supporting affidavit, or make an offer of proof, showing that the defenses are so inconsistent, mutually exclusive, and irreconcilable that it "clearly, affirmatively, and fully demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice." *Hana*, 447 Mich 325 at 346. "The failure to make this showing in the trial court, absent any significant indication on appeal that the requisite prejudice in fact occurred at trial, will preclude reversal of a joinder decision." *Id*. at 346-347. Mere inconsistency of defenses is not enough to require severance; the defenses must be mutually exclusive or irreconcilable. *Id*. at 349. "Incidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice. The 'tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other.'" *Id*. (citation omitted). In sum, severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 359-360.

To hold separate trials in these substantially identical cases would have been unnecessarily duplicative and excessive. The interests of justice, judicial economy, and orderly administration clearly favored a joint trial. Thomas has not provided any concrete facts or reasons to justify separate trials, and has not persuasively demonstrated that his substantial rights were prejudiced by a joint trial. The record does not show a "significant indication" that the requisite prejudice in fact occurred at trial. *Id*. at 346-347. Thomas's claim that his and Rush's defenses were antagonistic because of evidence against Rush (phone records and photographs) is an insufficient reason to grant a separate trial. Antagonistic defenses occur "when one person's claim of innocence is predicated solely on the guilt of a co-defendant." *United States v Harris*, 9 F3d 493, 501 (CA 6, 1993). Thomas and Rush did not present antagonistic defenses, but rather made essentially the same argument—that the prosecution's accomplice eyewitnesses, Foster and Larry, were not credible, and that they were not involved in Thompson's death, robbery, or any other

-11-

crime. Neither defendant pointed the finger at the other during trial. Thomas has not demonstrated that defendants' defenses would have required the jury to believe one defendant at the expense of the other.

Thomas and Rush were each convicted of Thompson's murder, armed robbery, mutilation of a dead body, and felony-firearm. Thomas suggests, without explanation, that evidence linking Rush to Foster and other participants, including him, would not have been admissible against him in a separate trial. However, "a fair trial does not include the right to exclude relevant and competent evidence," *Hana*, 447 Mich at 350, and evidence regarding Thomas's association or connection to Rush, Foster, and others would be both relevant and admissible. MRE 401.

Finally, the risk of prejudice from a joint trial may be allayed by a proper cautionary instruction. *Hana*, 447 Mich at 351, 356. The trial court, in its preliminary and final instructions, repeatedly instructed the jury that each case was to be decided separately, and that each defendant is entitled to have his case decided on the evidence and the law that applies to him. Again, it is well established that jurors are presumed to have followed their instructions, *Breidenbach*, 489 Mich at 13, and Thomas has not provided any basis for concluding that the jurors failed to do so in this regard.

Thomas has failed to identify any basis for severance. Because Thomas has failed to show that he was entitled to severance, defense counsel's failure to request severance cannot be considered objectively unreasonable. Further, considering the strong policy in favor of joint trials and the lack of any persuasive showing that severance was necessary to avoid potential prejudice to Thomas, there is no reasonable probability that a motion for severance would have been successful. Trial counsel cannot be deemed ineffective for failing to file a useless motion. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

b. FAILURE TO INVESTIGATE AND PRESENT EVIDENCE TO SUPPORT A DEFENSE

Thomas argues that his defense counsel was ineffective for failing to investigate and present evidence of an alleged jail phone call by Foster to Rush's mother. Thomas has not established the factual basis for this claim. According to Thomas, Foster told Rush's mother that "they had nothing to do with this crime and the people who did it are still out there." When Rush's mother asked Foster why he accepted "the 10 years," Foster responded: "I had no choice they were going to give me life, so I just made something up." However, there is no evidence of this phone call in the existing record or accompanying Thomas's brief on appeal. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999) (noting that a defendant has the burden of establishing the factual predicate to support his claim of ineffective assistance of counsel).

Furthermore, even accepting Thomas's claims that the phone call occurred and that he informed counsel about the call, Thomas has not overcome the strong presumption that counsel chose not to present this evidence at trial as a matter of strategy. Decisions about defense strategy, including what evidence to present, are matters of trial strategy, *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999), and counsel has wide discretion in matters of trial strategy. *Heft*, 299 Mich App at 83. "Counsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012) (citation and quotation marks omitted).

This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *People v Rice (On Remand)*, 235 Mich App 429, 445; 597 NW2d 843 (1999). Counsel could have chosen not to present evidence of the alleged jail phone call as a matter of trial strategy because, given that Foster's denial was made to the mother of one of his accomplices and that Foster had made other inconsistent statements to the police, which was a focus at trial, the phone call to Rush's mother would have not been significant in light of the other evidence presented at trial. Further, even if Foster's testimony had been impeached with evidence of this jail call, it would have had no effect the jury's perception of Larry's testimony. "The failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012) (citation omitted).

c. FAILURE TO CALL DEFENSE WITNESSES

Thomas also argues that defense counsel was ineffective for failing to call two alibi witnesses, Jennings (who allegedly would have testified that he took Thomas home before the crimes occurred) and Marina Briggs (who allegedly would have testified that Thomas arrived home at midnight and remained there until the following morning). Thomas also argues that a third witness, Scott, who had been identified as a participant in the crimes, could have provided testimony that "undermined the prosecution theory of who was actually the[re]." We disagree that defense counsel was ineffective.

Decisions about whether to call witnesses are also matters of trial strategy. *Rockey*, 237 Mich App at 76. A claim of ineffective assistance of counsel premised on the failure to call a witness is analyzed under the same standard as all other ineffective-assistance-of-counsel claims. *People v Jurewicz*, 506 Mich 914; 948 NW2d 448 (2020). Thomas claims that he provided these names to counsel, and it is apparent from the trial transcripts that counsel was aware of Jennings and Scott, at least. However, Thomas has not overcome the presumption that defense counsel chose not to call these witnesses for various strategy reasons, including that their testimony would have been unsupportive or even harmful to the defense.

Although Thomas argues that the proposed witnesses' testimony would have been exculpatory, he has not provided any witness affidavits, or identified any other evidence of record, showing the testimony that they would have provided if called.[16] Absent such a showing, Thomas

---

[16] As Thomas notes, Jennings testified at his own trial and, as part of his alibi defense, claimed that he and Foster had dropped Thomas at home before the crimes occurred. See *People v Jennings*, unpublished per curiam opinion of the Court of Appeals, issued July 2, 2020 (Docket No. 349222), p 1. But simply because Jennings testified at his own trial, after which he was convicted as charged, that Thomas was dropped off at home before the crimes does not mean that Jennings would have provided favorable testimony at Thomas's trial. In addition, at Jennings's trial, the prosecutor presented evidence of, and cross-examined Jennings about, the time line of events captured by video, Jennings's Impala being at the crime scene, and Jennings's and Foster's phones being at the scene at relevant times. See *id*. at 2-3. Therefore, it would not have been objectively unreasonable for Thomas's counsel to forgo calling Jennings as a defense witness in

has not established that he was prejudiced by defense counsel's failure to call the proposed witnesses at trial. *Nix*, 301 Mich App at 207.

### d. FAILURE TO CALL AN EXPERT WITNESS

Thomas also argues that defense counsel should have called a cell phone expert. We disagree. Thomas has not made an offer of proof regarding the substance of any testimony a defense expert on cell phone tracking could have offered. Thomas's mere speculation that an expert could have provided favorable testimony is insufficient to establish the factual predicate for his claim. *Hoag*, 460 Mich at 6. Accordingly, Thomas has not demonstrated that defense counsel was ineffective for failing to call a defense expert.

### e. FAILURE TO IMPEACH WITNESSES

Thomas also argues that defense counsel was ineffective for failing to impeach each of the prosecution's main witnesses, Foster and Larry, with specific information. We disagree. Again, decisions regarding how to impeach witnesses and what questions to ask are matters of trial strategy. *Rockey*, 237 Mich App at 76.

Thomas faults his counsel for failing to cross-examine Larry about why he first identified Rush as the shooter in his March 2018 police statement, but later "switched" and identified Scott as the shooter at Rush's preliminary examination on February 22, 2019. At trial, in response to the prosecutor's questions, Larry testified that his family had received threats before Rush's preliminary examination on February 22, 2019, and that, because of these threats, he did not testify at the preliminary examination that Rush had told him that he was the shooter. Therefore, the jury was aware that Larry first identified Rush as the shooter in his March 2018 statement, then identified Scott as the shooter at Rush's preliminary examination, and again identified Rush as the shooter at trial. The jury was also aware of why Larry claimed to have changed his story. Rush's trial attorney, who had the opportunity to cross-examine witnesses first, also addressed the matter when cross-examining Larry. Then, contrary to what Thomas argues, Thomas's counsel also specifically questioned Larry about this matter and about why he "switched" the identity of the shooter. Moreover, in closing argument, defense counsel used Larry's inconsistent statements to argue that Larry was not a credible witness, stating:

> Then you have Jarrin Larry who lies under oath to the prosecutor and to a judge and then the State goes out and tries to find corroborating evidence as to his alleged being threatened. They cannot find it.
>
> The detective told you he followed up on the story. The niece didn't want to have anything to do with it, talked with her mother. They didn't want to have anything to do with this case. So there was no corroborating evidence as to his story on the witness stand, at his lie on the witness stand.

---

this case when Jennings's own alibi, which included Thomas's whereabouts, had been successfully attacked at his own trial and Jennings had been convicted of the charged crimes.

He lied on the witness stand at a preliminary examination and, mind you, he lies when he has a plea agreement, a[n] Agreement of Special Consideration that he could jeopardize. He lied.

Accordingly, the record does not show that defense counsel's efforts to impeach Larry's testimony in this regard were objectively unreasonable or deficient. "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996).

Regarding Foster, Thomas argues that defense counsel was ineffective for failing to use an excerpt of Foster's testimony from Thomas's preliminary examination to demonstrate that Foster had no way of knowing who was with Larry when he called Larry about robbing Thompson. During Rush's counsel's cross-examination of Foster, he questioned Foster about how he would know who Rush was with at the time Foster made the call to Larry. On direct examination, Foster had testified that, after the phone call, he waited for Larry to come to meet him, and that he believed when he spoke to Larry on the phone that Larry was in the presence of Rush and Jennings. He also testified that three people got out of Larry's car when it arrived—Larry, Rush, and Thomas. Foster testified similarly at trial, i.e., that after calling Larry, Larry, Rush, and Thomas arrived in Larry's Impala.

The fact that Foster testified that he believed Larry was in the company of Rush and Jennings when Foster called him would have had little significance at trial, in light of Foster's testimony that he saw Thomas arrive with Rush and Larry a short time later. Given the insignificance of this point, particularly in light of the other strong evidence that was available for counsel to use to attack Foster's credibility, it was not objectively unreasonable for defense counsel not to use this information for impeachment purposes. Further, for the same reasons, there is no reasonable probability that counsel's inaction affected the outcome of 'Thomas's trial.

## 2. JURY INSTRUCTIONS

Thomas also argues that the trial court erred by declining to give a "mere presence" jury instruction. However, the record is clear that the trial court in fact gave such an instruction. In its final instructions, the trial court stated:

> 8.05. Even if the Defendant Carlos Thomas knew that the alleged crime was planned or was being committed the mere fact that he was present when it was committed is not enough to prove that he assisted in committing it.

This instruction is identical to M Crim JI 8.5, which states:

> Even if the defendant knew that the alleged crime was planned or was being committed, the mere fact that [he / she] was present when it was committed is not enough to prove that [he / she] assisted in committing it.

There is accordingly no merit to Thomas's claim.

Affirmed in Docket No. 353182.  Affirmed in Docket No. 353184.

/s/ Mark T. Boonstra
/s/ Mark J. Cavanagh
/s/ Michael J. Riordan