*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
April 21, 2022

Plaintiff-Appellee,

v

No. 353139
Macomb Circuit Court
LC No. 2018-001704-FC

RYAN MATTHEW EVANS,

Defendant-Appellant.

Before: LETICA, P.J., and REDFORD and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1). The court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to two concurrent terms of 30 to 50 years' imprisonment. The court also ordered that defendant be subject to lifetime electronic monitoring and registration as a sexual offender under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

The 34-year-old defendant was convicted of sexually assaulting the victim, the daughter of his then fiancée, in their residence in Chesterfield Township. Defendant lived in the home with his fiancée (the victim's mother), her four daughters, and the eldest daughter's boyfriend. The prosecution presented evidence that in December 2017 defendant sexually assaulted the victim, who was 13 years old at the time, on two occasions while she was sleeping.

The victim testified that on December 1, 2017, her friend, RW, spent the night at the victim's home. Defendant and the victim's mother went out to the casino. After the couple arrived home late at night, defendant entered the bedroom to say good night to the girls. According to the victim and RW, defendant smelled like beer and appeared to be intoxicated. Later that night, defendant entered the bedroom and digitally penetrated the victim's vagina, waking her from her sleep. The victim was wearing a t-shirt and spandex shorts, and defendant placed his hand under her shorts. During the assault, the victim tried to kick or tap RW's foot to wake her, but did not succeed. The victim was too scared to cry out or scream. Although there was another male living

-1-

in the home, the victim identified defendant as the perpetrator in light of his tattoo and build. Later, the victim revealed the assault to RW, but asked RW not to disclose the act to anyone else. Over the next two weeks, the victim spent as much time as she could at RW's home.

On December 14, 2017, the victim's sister, DM, had a friend, HM, spend the night. Although the sleepover occurred during the week, their school was closed the next day because of a snowstorm. DM became ill that evening and slept with the victim's mother. Consequently, the victim and HM spent the night sleeping on the living room floor. Once again, the victim awoke to find defendant digitally penetrating her vagina. For the second incident, HM awoke during the sexual assault, but defendant stopped the assault at that time.[1] HM promptly went back to sleep. Defendant instructed the victim to come to the bedroom that he shared with the victim's mother, but she did not comply. Later that morning, the victim disclosed this incident to her friend, RW.

Defendant went outside and shoveled snow with DM, while the victim and HM made pancakes. Defendant requested that the victim assist in snow shoveling, but she obtained permission from her mother to go to RW's home. The victim's mother asked defendant to drive the victim to RW's home. While defendant drove the victim to RW's home, there was no conversation. Later, defendant inquired, over the phone, whether RW was aware of what happened and asked the victim for a "clean slate." The victim placed the phone call on speakerphone for RW and RW's mother to hear. The victim opined that defendant was inquiring if RW was aware of the assaults. That evening, defendant brought the victim fast food to RW's home because the rest of the victim's family had eaten dinner at a restaurant. The victim expressly denied that she argued with defendant about an earbud case or its contents.

The victim returned home that evening. RW's mother texted the victim's mother to ensure that the victim had a discussion with her. During the conversation, the victim disclosed only the first sexual assault to her mother. When questioned, defendant cried and denied that he would ever do such an act.[2] That evening, the victim's mother drove defendant to his relative's home and took the victim to the police station the next day. Many days later, the victim disclosed the second incident that occurred on the snow day to her mother via text message.

Defendant testified at trial that he knew the victim's mother since 2013, and lived with the family for 18 months before the victim's allegations occurred. He acted as a stepfather and, until recently, had a good relationship with the victim. The two had nicknames for each other and participated in activities together. However, defendant was concerned about the victim's friends. He denied committing any act of sexual assault.

In his testimony, the defendant stated that on December 14, 2017 he was watching videos on the television when the victim took the remote to play video games. The victim was laughing

---

[1] HM testified that she woke up and merely observed defendant laying down on his back next to the victim, and she went back to sleep.

[2] The victim's mother testified that defendant was inebriated during the evening spent at the casino because he consumed 18 beers and, when confronted about the sexual assault allegations, he stated that he could not remember.

and giggling with some "guy" who was also playing the video game. Defendant asked the victim to shovel snow, but she obtained permission to go to RW's home from her mother. Defendant grabbed an earbud case from the victim and found a condom inside of it. This discovery caused an argument between defendant and the victim, and the argument continued as defendant drove the victim to RW's house. When defendant called the victim later about a "clean slate," he was referring to his discovery of a condom in the earbud case and not any sexual assault. When defendant discussed the allegations with the victim and the victim's mother, his fiancée, he did not proffer the discovery of the condom as a motive for the victim to lie. Defendant explained that he was surprised and taken off guard by the allegations. Furthermore, the only claim of sexual assault raised at that time allegedly occurred two weeks earlier on the night of the casino outing.

Despite defendant's denial of the allegations, he was convicted as charged. Defendant filed a motion for new trial, challenging the partial closure of the courtroom, prosecutorial error, the denial of effective assistance of counsel, and the sentencing requirements of sex offender registration and lifetime electronic monitoring. The trial court denied defendant's motion.

## II. PARTIALLY CLOSED COURTROOM

Defendant first alleges that he is entitled to a new trial because the trial court erroneously closed the courtroom during the victim's testimony. We disagree.

Before trial, the prosecutor moved for partial closure of the courtroom during the victim's testimony citing the trauma to the 13-year-old victim and relying on MCL 600.2163a. In response, defense counsel stipulated to this limited closure of the courtroom. Consequently, in light of the stipulation, the trial court entered an order granting the motion,[3] without rendering any findings addressing the factors for courtroom closure. When trial commenced,[4] the courtroom was apparently closed for the victim's testimony, but the trial was broadcast on closed-circuit television to the public, MCL 600.2163a(19).

Both the federal and state constitutions guarantee criminal defendants the right to a public trial. US Const, Am VI; Const 1963, art 1, § 20; *People v Vaughn*, 491 Mich 642, 650; 821 NW2d 288 (2012). Although the right is not absolute and may be limited, *id*. at 653, to justify a courtroom closure and facilitate appellate review of a trial court's decision, the court must state the interest that justified the closure and articulate specific findings to support the closure. *People v Davis*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 161396), slip op at pp 9-10. Further, the closure must be no broader than needed to protect the interest justifying it. *Id*. at slip op at p 10.

---

[3] This one-page July 18, 2018 order addressed a litany of motions and issues.

[4] When trial commenced, defendant was represented by new counsel. However, at the start of trial, the prior written ruling regarding partial courtroom closure was noted on the record. Further, when the victim testified, there was no indication on the record that the trial court advised the jury that the courtroom was closed. In fact, there was no statement or acknowledgment on the record that the courtroom was closed for the victim's testimony. Therefore, but for the prior motion and order granting the motion to partially close the courtroom, it was not apparent that a courtroom closure occurred.

Also, "the effect of a partial closure of trial does not reach the level of a total closure and only a substantial, rather than compelling reason for the closure is required." *People v Russell*, 297 Mich App 707, 720; 825 NW2d 623 (2012).

To balance the rights of child victims while still protecting the constitutional right to public trials, our Legislature adopted MCL 600.2163a(18), which provides:

> If upon the motion of a party made before trial the court finds on the record that the special arrangements specified in subsection (19) are necessary to protect the welfare of the witness, the court must order those special arrangements. In determining whether it is necessary to protect the welfare of the witness, the court must consider all of the following factors:
>
> (a) The age of the witness.
>
> (b) The nature of the offense or offenses.
>
> (c) The desire of the witness or the witness's family or guardian to have the testimony taken in a room closed to the public.
>
> (d) The physical condition of the witness.

MCL 600.2163a(19) requires the trial court to determine "on the record that [closure] is necessary to protect the welfare of the witness[.]" If that determination is made, the trial court must order one or more of several listed options that include removal of all unnecessary persons from the courtroom and public broadcast during witness testimony, defendant's courtroom placement away from the victim and all other witnesses, and podium placement in front of the witness stand. In this case, the trial court's order was consistent with the option prescribed in MCL 600.2163a(19)(a), which states:

> [t]hat all persons not necessary to the proceeding be excluded during the witness's testimony from the courtroom where the trial is held. The witness's testimony must be broadcast by closed-circuit television to the public in another location out of sight of the witness.

If preserved, the improper denial of a defendant's right to a public trial is considered a structural error. *Davis*, ___ Mich at ___, slip op at p 10. Preserved structural errors warrant automatic relief to the defendant because the harm generated by these errors is extensive but intrinsic and difficult to quantify. *Id*. Although preserved structural errors are subject to automatic reversal, forfeited claims of constitutional error are reviewed for plain error. *Id*. at 10-11. To warrant relief for a forfeited claim of error, a defendant must demonstrate that (1) an error occurred, (2) the error was plain, meaning clear or obvious, and (3) the plain error affected substantial rights. *Id*. (citation omitted). Reversal is warranted only when the plain forfeited error resulted in the conviction of an actually innocent person or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings regardless of the defendant's innocence. *Id*. at 11. When the trial court renders factual findings, they are reviewed for clear error. *Id*. Clear error occurs when the reviewing court is left with the definite and firm conviction that a mistake has been made. *Id*. (citation omitted).

Waiver is "the intentional relinquishment or abandonment of a known right." *Vaughn*, 491 Mich at 663 (quotation marks and citation omitted). "One who waives his rights under a rule may not seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *People v Buie*, 491 Mich 294, 306; 817 NW2d 23 (2012) (quotation marks and citation omitted). A party's failure to timely assert a right is not a waiver, but a forfeiture. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). A party's mere forfeiture of an issue does not extinguish any error. *Vaughn*, 491 Mich at 663. Waiver may be effected by counsel's action. *Carter*, 462 Mich at 218.

Here, defendant waived appellate review of this issue. That is, when presented in advance of any hearing and in writing, the prosecution's motion for partial closure of the courtroom during the victim's testimony, defendant stipulated to this limited closure. Thus, the trial court never addressed the criteria for courtroom closure as set forth in MCL 600.2163a(18) and the apparent remedy, MCL 600.2163a(19). In light of defendant's waiver of this issue, any error was extinguished. *Vaughn*, 491 Mich at 663.

When ruling on defendant's motion for a new trial, the trial court concluded that it committed plain error by failing to make findings on the record to establish the substantial interest in protecting the victim. Even if we assumed, without deciding, that plain forfeited error was at issue in this case, defendant is not entitled to appellate relief. The record establishes a substantial reason for the limited courtroom closure, and that the closure did not unnecessarily interfere with defendant's right to a public trial. The victim was only 13 years old at the time of the incidents and 14 years old at the time of trial; the nature of the offenses involved sexual penetration; defendant, as the live-in fiancé of the victim's mother, was the alleged perpetrator and served as a father figure to the victim; and the victim expressed fear and nervousness about disclosing the incidents because of the impact on her family. Considered together, these factors demonstrated that partial closure of the courtroom was necessary to protect the welfare of the victim, a minor witness. Further, the trial court narrowly tailored the closure by closing the courtroom only during the victim's testimony, and by providing that her testimony was to be broadcasted by closed-circuit television for the public to view outside the courtroom. Defendant posits no argument to counter these facts.

Nonetheless, defendant asserts that the closure of the courtroom during the victim's testimony had the effect of crediting her truthfulness, bolstering her fear of defendant, and garnering sympathy for her. But any suggestion of a connection between closing the courtroom during a minor witness's testimony and crediting that witness's truthfulness because of the closure seems speculative.[5] Further, in its final instructions, the trial court instructed the jury that it was not to let sympathy or prejudice influence its decision, that it was to decide the case only on the basis of the properly admitted evidence, and that it was to follow the court's instructions. These instructions were sufficient to protect defendant's substantial rights. Jurors are presumed to have

---

[5] Moreover, because the victim was the first witness to testify and the courtroom closure was never announced to the jury, there does not appear to be any record evidence that the jury was aware that such an accommodation was made for the young victim.

followed their instructions, *People v Breidenbach*, 489 Mich 1, 13; 798 NW2d 738 (2011), and defendant has not provided any basis for concluding that the jurors failed to do so in this case. Accordingly, defendant failed to establish entitlement to appellate relief.[6]

Defendant further alleges that defense counsel was ineffective for stipulating to the courtroom closure. We disagree.

Defendant preserved this claim by moving for a new trial or an evidentiary hearing in the trial court, and he also filed a motion to remand for a *Ginther*[7] hearing in this Court. *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

"Whether a defendant received ineffective assistance of trial counsel presents a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). This Court reviews a trial court's factual findings for clear error and its conclusions of law de novo. *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019). When no *Ginther* hearing addressing an issue is held in the trial court, appellate review is limited to mistakes apparent on the record. *Id*. Thus, an unpreserved claim of ineffective assistance of counsel is reviewed for errors present on the record. *People v Armisted*, 295 Mich App 32, 46; 811 NW2d 47 (2011) (citation omitted).

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *People v Schrauben*, 314 Mich App 181, 189-190; 886 NW2d

---

[6] We note that the recent *Davis* decision is factually and legally distinguishable from this case. In *Davis*, the victim was murdered during a robbery for drugs and money. Surveillance camera footage identified the defendant and an accomplice as possible suspects in the murder, and the accomplice testified against defendant at trial. On the second day of trial, a spectator, the mother of the victim's child, approached a juror and inquired if the juror worked at a local hospital. The trial court interviewed this spectator, admonished her for her conduct, and excluded all spectators for the duration of the trial except the mother of the victim. *Davis*, ___ Mich at ___, slip op at 2-4. In addition to rejecting the factual conclusion that the court-ordered closure was limited in scope to that day, the *Davis* Court concluded that the closure was broader than necessary to protect the impartiality of the jury, failed to consider reasonable alternatives to closing the proceeding, and failed to delineate adequate reasons to support the closure. *Id*. at slip op p 14. Moreover, the *Davis* Court concluded that, in this context, the existence of a forfeited structural error satisfied the third element of the plain-error standard, that the plain error affected substantial rights. *Id*. at 16-19. However, the Court also acknowledged that the formal rebuttable presumption of forfeited structural error could be rebutted where, for example, the trial court failed to sufficiently articulate the basis for the courtroom closure, but sufficient justification for the specific closure was present elsewhere in the record. *Id*. at 19. Indeed, in the matter at bar, the age of the victim, the nature of the offenses, the perpetrator of the offenses, and the impact of the report of the crime on the victim and her family were evident prior to and during the trial, not to mention the waiver of this issue. Accordingly, we respectfully conclude the *Davis* decision does not control our disposition of this issue.

[7] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

-6-

173 (2016). To obtain a new trial premised on ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Vaughn*, 491 Mich at 669, citing *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). It is presumed that defense counsel was effective, and a defendant must overcome the strong presumption that counsel's performance was sound trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). However, counsel may be found ineffective for the strategy employed when it is not a sound or reasonable strategy. *People v Dalesandro*, 165 Mich App 569, 577-578; 419 NW2d 609 (1988). The burden of establishing the factual predicate for a claim of ineffective assistance is on the defendant. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

In denying defendant's motion for a new trial, the trial court ruled that defendant failed to meet his burden of demonstrating ineffective assistance of counsel because of the stipulation to partially close the courtroom. In so ruling, the trial court rejected defendant's allegations that the courtroom closure bolstered the victim's credibility by highlighting her fear and generating sympathy such that the jury concluded that the sexual assaults must have occurred. The trial court found that defendant's allegations were mere speculation and did not demonstrate that the outcome of the trial would have been different if the courtroom remained open during the victim's testimony. We cannot conclude that the underlying factual findings were clearly erroneous and that the trial court erred in its conclusion of law. *Miller*, 326 Mich App at 726. The courtroom closure was never announced to the jury. Because the victim was the first witness to testify, the jury could not compare the number of spectators present for her testimony as opposed to the spectators present for the other witnesses. And when the motion for partial closure of the courtroom was raised, it was requested that trial court broadcast the testimony on closed-circuit television in accordance with MCL 600.2163a(17).

While defense counsel could have objected to the prosecutor's motion or requested that the trial court articulate its reasons for granting the motion, defense counsel reasonably could have determined that any objection would have been futile because the relevant considerations under MCL 600.2163a supported the closure. Further, it is apparent from the trial court's decision denying defendant's motion for a new trial that it would have granted the prosecutor's motion even if defense counsel had objected. Thus, there is no reasonable probability that counsel's failure to object affected the outcome of defendant's trial. Consequently, defendant cannot establish a claim of ineffective assistance of counsel on this basis.

## III. PROSECUTOR'S CLOSING ARGUMENT

Next, defendant contends that the prosecutor engaged in misconduct[8] by impermissibly vouching for the victim's credibility during closing argument. We disagree.

Because defendant did not challenge the prosecutorial statements with contemporaneous objections and request for curative instructions, appellate review is limited to outcome-determinative plain error. *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017). Error requiring reversal will not be found where a curative instruction could have alleviated any prejudicial effect. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008).

A claim of prosecutorial misconduct is evaluated on a case-by-case basis. *Mullins*, 322 Mich App at 172. To obtain relief for a claim of prosecutorial misconduct, a defendant must demonstrate that he was denied a fair trial. *People v Bosca*, 310 Mich App 1, 26; 871 NW2d 307 (2015). When the claim of misconduct is premised on a prosecutor's statements, the remarks must be examined in context to determine if defendant was denied a fair and impartial trial. *Mullins*, 322 Mich App at 172. The statements must be assessed in light of the defense arguments and the relationship between the comments and the evidence admitted at trial. *Id*. When presenting argument, the prosecutor has great latitude and is free to argue the evidence and all reasonable inferences arising from the evidence as it relates to the theory of the case. *Id*.

Defendant submits that the prosecutor improperly vouched for the victim's testimony during closing argument by stating that the victim was truthful:

> [The victim] was truthful with [RW] right way, [the victim] was truthful with [RW's mother] right away. She told them both about both incidents.

> \* \* \*

> You're going to hear instructions from the judge from [sic] judging the credibility of the witnesses, and you're also going to hear this: which testimony agrees best with the other testimony, the other evidence that you have seen and heard in the case. Something that was very striking to me and I hope some of you realized it when you were watching [the victim] testifying and you were watching [RW] testify and even [HM], I asked every single one of these girls which side was so and so sleeping on. Were they on the right side or were they on your left side. Every single one of those girls gave an indication that they were actually reliving what happened, especially [the victim]. [The victim] was asked more than anybody where people were. And these are cue [sic], ladies and gentlemen, that's another thing that you can look at is people's body [sic] and how they act. When you're

---

[8] Defendant appropriately labelled this issue as prosecutorial error. Indeed, only the most extremely rare cases rise to the level of prosecutorial misconduct. *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 2015). However, we will use the phrase "prosecutorial misconduct" because it has become a term of art in criminal appeals and in the applicable caselaw. *Id*.

reliving something you kind of get lost in your head, like—and I watched those girls do that. I watched [the victim] relive exactly what happened and where the defendant was located and where [RW] was located on the first night and where [HM] was located on the snow day morning. Those are things that can lend credibility to a witness and lend credibility to which evidence best fits with what we have in the rest of the case.

A prosecutor may not vouch for the credibility of a witness by conveying that he or she has some special knowledge that the witness is testifying truthfully. *People v Roscoe*, 303 Mich App 633, 649; 846 NW2d 402 (2014). However, prosecutors have great latitude when arguing at trial and may fairly respond to an issue raised by the defendant. *Mullins*, 322 Mich App at 172. They may argue the evidence and all reasonable inferences that arise from the evidence as it relates to their theory of the case, and they need not state their inferences in the blandest possible language. *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). They are permitted to argue from the facts in evidence that a witness is worthy of belief or had no motive to lie. *People v Cain*, 299 Mich App 27, 36; 829 NW2d 37 (2012), vacated in part on other grounds 495 Mich 874 (2013).

The prosecutor did not refer to any special knowledge, beyond the evidence presented at trial, to indicate that she knew the victim was truthful. Further, it was the defense theory that the victim was not credible, and the prosecutor was permitted to respond that she had no motive to lie. See *id*. at 37. For example, in opening statement, defense counsel stated: "The evidence will show that [the victim] gives several different accounts and in these different accounts there are major differences in what happens. The story is told a number of times, approximately a handful of times, and different versions and different facts that go along with it. There won't be minor differences. There will be major differences." Counsel also stated: "The evidence will show that there was a motivation [to lie]." Defense counsel cross-examined the victim about her account of what occurred, and asked questions implying that the victim was being untruthful. In closing argument, defense counsel reiterated and summarized the defense theory, arguing, *inter alia*, that there were "major inconsistencies in [the victim's] testimony," that she gave varying versions of what occurred when disclosing the alleged incidents, and that she had a motive to lie because she was reacting to defendant finding a condom in her possession. Defense counsel also remarked during closing argument that defendant "was very open and honest" and that defendant "told you very honestly he is not guilty." Defense counsel's opening statement, cross-examination of the victim, and closing argument clearly involved challenges to the credibility of the victim's account of the offenses, while asserting that defendant was being truthful, in his account. Thus, the prosecutor's argument was responsive to the defense theory presented throughout trial that the victim was untruthful. Therefore, the prosecutor's remarks were not improper.

Furthermore, to the extent that the remarks could be considered improper, defendant is not entitled to a new trial. In its final instructions, the trial court instructed the jury that the lawyers' statements and arguments are not evidence, that the jurors are the sole judges of witness credibility, and that the jury was to follow the court's instructions. The trial court's instructions were sufficient to dispel any possible prejudice and to protect defendant's substantial rights. *Breidenbach*, 489 Mich at 13; *People v Long*, 246 Mich App 582, 588; 633 NW2d 843 (2001).

Defendant also contends that defense counsel was ineffective for failing to object to the prosecutor's remarks. For the reasons previously discussed, the prosecutor's remarks, which were

responsive to the evidence and the defense theories presented at trial, were not improper. Therefore, counsel's failure to object was not deficient. *Ericksen*, 288 Mich App at 201. Further, because the trial court's jury instructions were sufficient to dispel any possible prejudice, there is no reasonable probability that counsel's failure to object affected the outcome of defendant's trial. *Vaughn*, 491 Mich at 669. Accordingly, defendant has not established a claim of ineffective assistance of counsel.

## IV. GREAT WEIGHT OF THE EVIDENCE

Defendant posits that he should receive a new trial because the great weight of the evidence failed to show that he sexually assaulted the victim. In particular, he contends that the victim's "testimony did not make sense and she had a reason to lie." We disagree.

A new trial may be granted if the verdict results in a miscarriage of justice. MCR 6.431(B). We review a trial court's decision denying a motion for a new trial for an abuse of discretion. *People v Gaines*, 306 Mich App 289, 296; 856 NW2d 222 (2014). In evaluating whether a verdict is against the great weight of the evidence, the question is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v Lemmon*, 456 Mich 625, 627; 576 NW2d 129 (1998); *Unger*, 278 Mich App at 232. A verdict is generally against the great weight of the evidence only when it is "more likely the result of causes outside the record such as passion, prejudice, sympathy, or some other extraneous influence." *People v Anderson*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 354860), slip op at p 2 (citation omitted). Absent compelling circumstances, the credibility of witnesses is for the jury to determine. See *Lemmon,* 456 Mich at 642-643.

The prosecutor's theory at trial was that defendant engaged in sexual acts that involved two instances of digital penetration under circumstances that constituted CSC-I. As applicable to this case, a "person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with a person between the ages of 13 and 16," and the actor is a member of the victim's household. MCL 750.520b(1)(b)(*i*). "The testimony of a victim need not be corroborated in prosecutions under sections 520b to 520g." MCL 750.520h. In this case, the victim gave detailed testimony about the two encounters with defendant that formed the basis for the two CSC-I charges. The victim testified that she was 13 years old when defendant, her mother's fiancé and a resident in the family home, digitally penetrated her vagina on December 1 and 14. The evidence does not preponderate so heavily against the jury's verdict that it would be a miscarriage of justice to allow the verdict to stand. *Lemmon*, 456 Mich at 647.

Defendant's great weight arguments focus principally on the victim's credibility. He also submits that it was implausible or nonsensical that the victim did not awaken until she was being digitally penetrated in light of the tight spandex shorts[9] that she was wearing; she kicked RW to wake her up, but RW did not wake up; the second incident occurred during the morning hours in the living room with another person present; and the victim's report to the police only involved one assault that characterized defendant's finger as "by" her vagina. However, during the victim's

---

[9] Defendant's characterization that the shorts were "tight spandex" is not an undisputed fact admitted in the record.

testimony, the prosecutor questioned the victim regarding the length of the shorts that she was wearing at the time of the first assault. The victim could not recall the length, but noted that, at trial, she was wearing a similar pair of spandex shorts underneath her skirt. The victim stood up to display the shorts, but the prosecutor instructed that the victim did not need to lift her skirt. The prosecutor and defense counsel consulted with the trial court, and it was agreed that the length of the shorts ended at the victim's mid-thigh. Thus, the shorts were apparently displayed to the jury to determine the plausibility of the victim's testimony in this instance.[10]

Furthermore, the victim testified that she tried to kick or tap RW when the first sexual assault occurred but did not succeed. RW testified that she did not wake up and that she was a deep sleeper. Although defendant questions that any sexual assault would occur in the living room during the morning hours with another person present, the victim testified that it did, in fact, occur. Specifically, the victim testified that she was asleep on the living room floor with HM next to her when defendant digitally penetrated her. During the assault, HM woke up, and the victim testified that defendant stopped the abuse. During her testimony, HM confirmed that she woke up, but merely saw defendant laying on his back next to the victim, and HM went back to sleep. Furthermore, the number of instances of abuse reported, the timing of the report, and the extent of the abuse all presented questions for resolution by the jury. Conflicting testimony and questions regarding the credibility of witnesses, however, are not sufficient grounds for granting a new trial. *Lemmon*, 456 Mich at 643. Moreover, a jury is free to believe all, none, or part of a witness's testimony. *People v Perry*, 460 Mich 55, 63; 594 NW2d 477 (1999). The jury heard the victim's testimony and was aware of the inconsistencies and discrepancies with some of her trial testimony, including a comparison to what she initially reported to the police. Defense counsel cross-examined the victim, emphasized these matters, and presented credibility arguments to the jury, including that the victim was upset with defendant for other reasons. A reviewing court should ordinarily defer to the jury's determination of credibility "unless it can be said that directly contradictory testimony was so far impeached that it 'was deprived of all probative value or that the jury could not believe it,' or contradicted indisputable physical facts or defied physical realities[.]" *Lemmon*, 456 Mich at 644-646 (citation omitted). That is not the case here. The fact that defendant disagrees with the victim's version of the events, claimed that he did not sexually assault the victim, and believed that she was upset with him for other reasons, did not deprive the victim's testimony of all probative value. It was within the province of the jury to evaluate the conflicting versions of events and find that the victim's claims were established by her testimony. This case does not present circumstances that warrant the unusual step of overriding the jury's credibility determination. It was up to the jury to assess the weight and reliability of the evidence in light of the factors explored by the defense. The evidence does not preponderate so heavily against the jury's verdict that it would be a miscarriage of justice to allow the verdict to stand. Accordingly, the jury's verdict is not against the great weight of the evidence, and defendant is not entitled to a new trial on this basis.[11]

---

[10] The victim could not recall what she wore during the second sexual assault.

[11] The trial court addressed this issue in denying defendant's motion for a new trial and similarly found that the victim's testimonial inconsistencies were relatively minor, did not defy physical realities, and were not impeached to remove all probative value.

## V. SENTENCING

Lastly, defendant presents three arguments in support of his request for sentencing relief, none of which have merit. "To preserve a sentencing issue for appeal, a defendant must raise the issue at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed in the [C]ourt of [A]ppeals." *People v Clark*, 315 Mich App 219, 223-224; 888 NW2d 309 (2016) (quotation marks and citations omitted). Because defendant raised his sentencing issues in his motion for resentencing in the trial court, they are preserved.

### A. UNREASONABLE AND DISPROPORTIONATE SENTENCE

Defendant contends that his 30-year minimum sentences are disproportionate, unreasonable, and unconstitutionally cruel or unusual. We disagree.

The trial court scored the guidelines for defendant's convictions of CSC-I and sentenced defendant to a minimum term of 30 years for each conviction. The sentences are in the upper half, but within, the applicable guidelines range of 126 to 420 months.[12] Because defendant did not receive a sentence that exceeds the advisory sentencing guidelines range, his sentence may not be reviewed for reasonableness. "[T]his Court is required to review for reasonableness only those sentences that depart from the range recommended by the statutory guidelines." *People v Anderson*, 322 Mich App 622, 636; 912 NW2d 607 (2018). If a trial court does not depart from the recommended minimum sentence range, this Court need not evaluate the defendant's sentence for reasonableness and must affirm unless there was an error in scoring the guidelines or the trial court relied on inaccurate information. *Id.* at 636-637, citing MCL 769.34(10) (if a sentence is within the sentencing guidelines range, this Court must affirm the sentence absent a scoring error or reliance on inaccurate information); see also *People v Posey*, 334 Mich App 338, 346; 964 NW2d 862 (2020), lv pending.[13] Defendant does not argue that there was any error in the calculation of his sentencing guidelines range, or that the trial court relied on inaccurate information. Accordingly, because defendant's minimum sentences are within the sentencing guidelines range, we must affirm defendant's sentences, absent any constitutional violation.

Regarding defendant's constitutional argument, "[t]he Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16, whereas the United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII." *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011). This includes "a prohibition on grossly disproportionate sentences." *People v Bullock*, 440 Mich 15, 32; 485 NW2d 866 (1992). But "[a] sentence within the guidelines range is presumptively proportionate, and a proportionate sentence is not cruel or unusual." *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). "In order to overcome the presumption that the sentence is proportionate, a defendant must present unusual

---

[12] CSC-I is a class A offense, MCL 777.16y, governed by the sentencing grid at MCL 777.62. The trial court's scoring of the guidelines placed defendant in the F-II cell of the sentencing grid, for which the minimum sentence range is 126 to 420 months for a fourth-offense habitual offender. MCL 777.62; MCL 777.21(3)(c).

[13] To the extent defendant argues that *Posey* was wrongly decided, the propriety of the decision is pending in our Supreme Court.

circumstances that would render the presumptively proportionate sentence disproportionate." *Id*. (quotation marks and citation omitted).

In support of his argument that his sentences are cruel or unusual, defendant relies on the following factors: (1) his CSC-I offenses are less serious because the trial court's scoring of the guidelines placed him only in the F-II cell, as opposed to the F-VI cell, of the applicable sentencing grid; (2) this is his first CSC conviction; (3) the probation department recommended a lower minimum sentence, and (4) his belief that the sentences do not meet the "sentencing goal of rehabilitation." We disagree that these factors are unusual circumstances that overcome the presumption of proportionality. Defendant ignores his status as a fourth-offense habitual offender, which increased the upper end of the guidelines range by 100%. MCL 777.21(3)(c). At sentencing, the trial court noted that defendant does not have "too many redeeming qualities," and that his prior criminal history consisted of 16 felonies, eight misdemeanors, a juvenile record "and it culminated in this." Further, while defendant seeks to diminish the seriousness of the offenses, the victim provided a victim-impact statement that explained how defendant's behavior had negatively affected her life. As the trial court noted in denying defendant's motion for resentencing, defendant does not argue unusual circumstances, but instead disagrees with the trial court's exercise of discretion in imposing a sentence "on the higher end of the guidelines based on the circumstances of the offenses and his prior criminal history." Accordingly, defendant has not demonstrated any unusual circumstance to overcome the presumption that his minimum sentences, which are within the guidelines range, are proportionate. Therefore, his sentences are presumptively not cruel or unusual. *Bowling*, 299 Mich App at 558.

## B. SEX OFFENDER REGISTRATION

Defendant also alleges that the requirement of lifetime registration under SORA is cruel or unusual punishment in violation of the Eighth Amendment to the United States Constitution and the Michigan Constitution. US Const, Am VIII; Const 1963, art 1, § 16. We disagree.

This Court reviews constitutional issues de novo. *People v Harris*, 499 Mich 332, 342; 885 NW2d 832 (2016).

Requiring defendant to register as a sex offender for the rest of his life is not cruel or unusual punishment. A party challenging the constitutionality of a statute has the burden of proving its invalidity. *People v Sadows*, 283 Mich App 65, 67; 768 NW2d 93 (2009). Defendant acknowledges that this Court has previously held that SORA reporting requirements are not punishment because they are designed to protect the public, not punish the offender. *People v Tucker*, 312 Mich App 645, 681-683; 879 NW2d 906 (2015). As such, the requirement could not constitute cruel or unusual punishment. *Id*. at 683. More recently, however, our Supreme Court held that the SORA registration requirements are criminal punishments. *People v Betts*, 507 Mich 527, 558; 968 NW2d 497 (2021). Although *Betts* involved an ex post facto claim, whereas *Tucker* involved a claim that SORA registration is cruel and unusual punishment, the foundation for the holding in *Tucker*—that the SORA reporting requirements are not punishment—was rejected in *Betts*. Therefore, we must determine whether this registration penalty is cruel or unusual.

To determine whether a punishment is cruel or unusual, courts assess whether it is "unjustifiably disproportionate" to the offense committed by considering four factors: (1) the

harshness of the penalty compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation. *Bullock*, 440 Mich at 33-34.

Regarding the harshness of the penalty compared to the gravity of the offense, the statutory maximum in Michigan for CSC-I is imprisonment for life, MCL 750.520b(2)(a). SORA, which requires defendant to register as a sex offender, is a lesser punishment than life imprisonment. Thus, the penalty is not unduly harsh considering the gravity of defendant's crimes. Further, regarding the remaining factors, defendant was the victim's mother's fiancé, whom the victim considered a father figure. Moreover, the victim was below the age of consent and there was a significant age difference between defendant, who was a 34 years old, and the victim, who was 13, at the time of both offenses. Thus, defendant took advantage of a child, and instilled in her lasting fear and distrust. The gravity of defendant's offense should not be discounted merely because he had no prior record of sexual offenses. Considering the gravity of defendant's offense, mandatory lifetime registration is not a disproportionately harsh punishment in defendant's case.

Further, lifetime registration for sex offenders in Michigan is not unique compared to other states, even if defendants in other states are afforded greater latitude to petition for removal from the registry. And, lastly, regarding the goal of rehabilitation, although SORA's asserted rehabilitative effect is uncertain, lifetime registration is not unjustifiably disproportionate as applied to defendant because the registry may still have a deterrent effect on his behavior. On the basis of the facts of defendant's case, it is unclear whether his exploitative behavior would have ceased if the victim did not disclose the incidents. Thus, being placed on the sex offender registry for life may serve as a deterrent against recidivating. For these reasons, SORA's lifetime registration requirement is not unjustifiably disproportionate as applied to the facts of defendant's offense. *Bullock*, 440 Mich at 30. Thus, defendant is not entitled to appellate relief on this basis.

## C. LIFETIME ELECTRONIC MONITORING

In his last sentencing claim, defendant argues that the imposition of lifetime electronic monitoring is unconstitutionally cruel or unusual punishment, and also constitutes an unreasonable search.

As defendant recognizes, in *People v Hallak*, 310 Mich App 555; 873 NW2d 811 (2015), rev'd in part on other grounds 499 Mich 879 (2016), this Court considered and rejected these same arguments. *Id*. at 576-577. Defendant has failed to present any basis for distinguishing *Hallak*, which this Court is bound to follow under MCR 7.215(J)(1). Consequently, defendant is not entitled to appellate relief on this basis.

Affirmed.

/s/ Anica Letica
/s/ James Robert Redford
/s/ Michelle M. Rick